991 P.2d 638 (1999)
98 Wash.App. 286
LITHO COLOR, INC., a Washington corporation, Appellant/Cross-Respondent,
v.
PACIFIC EMPLOYERS INSURANCE, COMPANY, a foreign corporation and Hartford Steam Boiler Inspection and Insurance Company, a foreign corporation, Respondents/Cross-Appellants.
No. 41294-9-I.
Court of Appeals of Washington, Division 1.
September 20, 1999.
Publication Ordered November 18, 1999.
*640 William Kinsel, Michael McCormack, Seattle, for Appellant/Cross-Respondent.
Craig Hinton Bennion, Stephen Murray Todd, Seattle, for Respondents/Cross-Appellants.
*639 APPELWICK, J.
Litho Color sought coverage under a "Boiler and Machinery" (B & M) endorsement to its commercial property insurance policy for claims arising in October 1991 and February 1992. Pacific Employers Insurance Company (PEIC) issued the B & M policy; however, it was fully reinsured by Hartford Steam Boiler Inspection and Insurance Company (HSB). Prior to trial, Litho and PEIC reached a settlement that released PEIC from certain claims and liabilities in exchange *641 for $335,000, but technically kept PEIC in the suit.
On appeal, Litho, HSB and PEIC each assign errors to the trial court's rulings with respect to the offset of a portion of the settlement against the jury award, as well as other trial court rulings. We hold that HSB and PEIC were entitled to a full offset of the settlement amount against the jury award because Litho failed to allocate portions of the settlement to specific causes of action.

FACTS
Jackie and Douglas Ward own Litho Color (Litho), a Seattle color scan and pre-press company. In 1987, Litho purchased a Crosfield 635E Color Scanner, which reduces film to a digital format. And in August of 1990, Litho purchased a "Studio 19" which retouches and alters pictures by a computerized digital process. Litho also entered into a maintenance agreement with DuPont Crosfield, the manufacturer of the machines. DuPont Crosfield employee Michael Whiteman generally responded to service calls from Litho.
Pacific Employers Insurance Company (PEIC) provided Litho with commercial property and general liability insurance during 1990, 1991 and 1992. Litho also purchased boiler and machinery (B & M) insurance from PEIC to protect against damages to certain equipment and related loss of income. The B & M insurance is characterized as an endorsement to the PEIC policy. The B & M Coverage Form states:
A Covered Cause of Loss is an "accident" to an "object"shown in the Declarations. An "object" must be in use or connected ready for use at the location specified for it at the time of the "accident."
Additionally, the contract defines "accident" to specifically require proof of physical damage necessitating repair or replacement.
Although PEIC issued the B & M endorsement, the policy was reinsured in full by Hartford Steam Boiler Inspection and Insurance Company (HSB). The reinsurance agreement between HSB and PEIC specifies that "[t]he [r]einsurer at its expense will investigate, negotiate and enter into settlement agreements or defend all such claims and losses in accordance with the terms of this coverage subject to this agreement." Under the reinsurance agreement, PEIC maintained final authority over the disposition of any claim filed by Litho.
The Wards claim that the air conditioning at Litho malfunctioned and that the subsequent temperatures damaged the scanner and the Studio 910. The first incident occurred in May 1991, when temperatures at Litho reached 82 degrees. The second incident occurred in October 1991, when temperatures reached 95 degrees.
Litho's third claim arises from an incident that occurred in February of 1992, when temperatures at Litho hit 135 degrees or more. Prior to this incident, the City of Seattle notified Litho that the City would be turning off the water to Litho's building in order to work on the water line. Because Litho's air conditioner was connected to the water supply, the Wards intended to turn off the air conditioner and shut down the plant on Saturday, February 8. However, an employee failed to shut down the scanner and the Studio 910. The following Monday morning, Douglas Ward and Michael Whiteman found that it was extremely warm at Litho.
Litho subsequently notified HSB of the overheating accident. Litho claimed that both the scanner and the Studio 910 were significantly damaged by its failure to turn off the machines when the air conditioner was turned off. Litho also claimed that the overheating incidents so damaged the equipment that the business could not operate, or operated at a reduced capacity, which resulted in a loss of income.
HSB has continuously disputed Litho's claims regarding the nature and extent of the damage to those machines. The only damage that HSB acknowledged was that there was an "accident as defined by the policy" that harmed a Winchester disk drive, for which HSB paid $8,898.74. HSB rejected Litho's additional requests for repair and its replacement estimates.
On August 31, 1994, Litho filed a complaint against PEIC and HSB to enforce the insurance contract. Litho also alleged *642 breach of contract, bad faith, and violations of the Consumer Protection Act RCW 19.86. The trial court subsequently dismissed Litho's breach of contract claim as duplicative of Litho's efforts to enforce the insurance contract.
On May 3, 1996, three days before the trial began, Litho entered into a partial settlement with PEIC. Litho released PEIC from liability under the commercial property portion of the policy and for attorney fees, claims of bad faith, and Consumer Protection Act violations, in exchange for $335,000. The settlement does not specifically allocate the proportionate values of the various claims.
The settlement did not release PEIC and HSB "from their obligations or liability, if any, under the boiler and machinery endorsement to the policy." The settlement states that Litho reserved "all of its statutory, regulatory, contractual, extracontractual and other common law rights against [HSB] including but not limited to [HSB's] common law duty of good faith and duty of fair practices under the Consumer Protection Act."
Litho then disposed of the claim that related to the May 1991 incident by an order of dismissal entered prior to trial. Thus, Litho's claims against PEIC and HSB related to the October 1991 and February 1992 incidents proceeded to trial. The trial was bifurcated to determine coverage in the first part; and, if the jury found coverage, the bad faith and Consumer Protection Act claims were to be decided in the second part.
At trial, Litho relied primarily on the testimony of Michael Whiteman and Jackie Ward to show that the machines were damaged by the overheating incidents and that it was entitled to coverage under the B & M policy. Whiteman testified, on a "more probable than not" basis, that machine parts were damaged by the February 1992 overheating incident. He also testified that there were problems with specific machine parts following the 1992 incident. However, he could not specifically explain how those problems may have resulted from the overheating, nor could he recall any specific repairs that occurred after the incident.
Jackie Ward testified, based on her personal observations, that Litho's equipment was damaged by excessive heat. She specifically concluded that the scanner and the Studio 910 were damaged by the February 1992 incident.
At the close of Litho's case-in-chief, HSB moved for a directed verdict, arguing that Litho failed in its burden of proving that the Studio 910 and the scanner were damaged by the overheating incidents as required for coverage under the B & M endorsement. The trial court denied the motion.
The defendants then put forth the following evidence to show that Litho's machines were not damaged such that coverage was required under the B & M policy.
First, Mr. Whiteman testified that he could not specifically recall performing, nor did his records reflect, any repairs to the scanner following the 1992 incident. Second, Mr. Whiteman stated that he did not have any knowledge that any parts of the Litho equipment were damaged in February 1992, except for the Studio 910 Winchester disk drive, which HSB paid for. Whiteman also testified, and DuPont Crosfield service records reflect, that the scanner had malfunctioned several times prior to any of the subject claims being made.
And third, HSB retained three separate and independent analyst companies to assess Litho's claims. All three concluded that the scanner and Studio 910 did not show any physical damage, nor any problems associated with heat exposure, but rather, the machines exhibited problems associated with improper maintenance and with the power supply. Finally, a fourth expert, hired by Litho, concluded that the machine malfunctions were due to inadequate maintenance and improper installation.
The jury deadlocked on the October 1991 claim. Regarding the February 1992 claim, the jury awarded Litho $529,954: $366,000 for physical damage to the machines, $156,240 for loss due to business interruption, and $7,714 for extra expenses that Litho incurred.
The trial court subsequently set aside the business interruption award of $156,240, leaving a jury award of $373,714. HSB then made a motion for a total offset of the PEIC *643 settlement against the verdict. The court allowed an offset of $193,000 by deducting from the PEIC settlement payment of $335,000 those amounts which, the court concluded, did not constitute double recovery. The trial court attributed $75,000 of the settlement amount to bad faith exposure and $67,000 of the settlement amount to exposure for attorney's fees. After subtracting those amounts from the PEIC settlement, the remaining $193,000 was deducted from the $373,714 jury award, leaving a principal verdict of $180,714.
After the trial, HSB filed a "Motion for Judgment as a Matter of Law or in the Alternative for a New Trial" which the court denied finding that the "jury awards were supported by substantial evidence."
Cross-motions for summary judgment were submitted regarding the trial court's dismissal of the business interruption award and on the bad faith and CPA claims. Litho argued that HSB acted in bad faith and violated the CPA as a matter of law. Litho further argued that HSB had either waived or was estopped from asserting the defense of lack of privity as a result of its prior conduct and admissions in court.
HSB counter-argued that, as a reinsurer, it was not in privity with Litho and therefore did not owe Litho a duty of good faith. The trial court granted HSB's post-trial motions by dismissing Litho's claims for bad faith, for violations of the CPA, and for attorney fees under Olympic Steamship v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991). The trial court also granted HSB's motion to deny attorney fees.
The parties subsequently settled the claim regarding the October 1991 incident and final judgment was entered against PEIC and HSB in the amount of $215,401.39. It included $6,847.65 for Supplementary Payment Benefits, $445 for costs, $27,269.74 for Post-Verdict, Pre-judgment Interest, and a Statutory Attorney Fee of $125.

ANALYSIS
The Trial Court Erred in Failing to Grant HSB a Full Offset of the $335,000 Settlement Amount.
Litho assigns error to the trial court's grant of a partial offset to HSB and PEIC of $193,000 from the $335,000 previously paid by PEIC to settle the commercial property, bad faith, attorney fee and CPA claims against it, which offset was used to reduce the verdict on the B & M insurance. Conversely, HSB assigns error to the offset, claiming that it should have been for the full settlement amount.
Principles of contract law control the formation of a settlement agreement. Morris v. Maks, 69 Wash.App. 865, 868, 850 P.2d 1357, review denied, 122 Wash.2d 1020, 863 P.2d 1353 (1993). Absent disputed facts, the legal effect of a contract is a question of law to be reviewed de novo. Yeats v. Estate of Yeats, 90 Wash.2d 201, 204, 580 P.2d 617 (1978); Clevco, Inc. v. Municipality of Metropolitan Seattle, 59 Wash.App. 536, 539, 799 P.2d 1183 (1990), review denied, 117 Wash.2d 1006, 815 P.2d 265 (1991).
Litho sued PEIC and HSB for the same claims of damage to its equipment under both the commercial property coverage and the B & M endorsement. Before the trial, Litho and PEIC reached a settlement in which PEIC paid Litho $335,000 in consideration for a release from its contract, bad faith, attorney fee and statutory claims under the commercial property coverage, while reserving its claims with PEIC and HSB under the B & M endorsement. In the settlement agreement, Litho specifically stated that the agreement was not intended to quantify any particular aspect of Litho's claims against PEIC and HSB. Thus, Litho clearly chose not to allocate portions of the settlement amount to specific causes of action.
The jury subsequently awarded Litho $366,000 for liability under the B & M endorsement. The trial court then granted an offset of $193,000 by deducting from the PEIC payment of $335,000 those amounts the court concluded did not constitute double recovery. The trial court determined that $75,000 was for bad faith exposure, and $67,000 was for attorneys' fees, leaving $142,000 of the settlement, which was not to be used as an offset.
In the context of industrial insurance claims, this court has held that settling parties *644 bear the burden of allocating portions of lump sum settlements to specific causes of action. Mills v. Department of Labor and Industries, 72 Wash.App. 575, 577-78, 865 P.2d 41, review denied, 124 Wash.2d 1008, 879 P.2d 292 (1994). In this context, at least one circuit has held that when the plaintiff fails to apportion settlement amounts, the defendants are entitled to full credit for the unapportioned settlement amount; less the plaintiff would be rewarded for drafting an ambiguous settlement agreement. U.S. Industries v. Touche Ross & Co., 854 F.2d 1223, 1262-1263 (10th Cir.1988). We adopt this analysis.
Litho nonetheless argues that the defendants were not entitled to any offset against liability under the B & M endorsement for amounts paid to settle the commercial property coverage. Litho contends that the two forms of coverage are separate and distinct, allowing mutually exclusive offsets, but not allowing one to offset the other. Under Litho's proposed reading of the policies, Litho could recover the full payment of all the physical damage to its machines under each coverage separately.
In Washington, however, an insurance policy must be given a practical and reasonable interpretation, one that fulfills the apparent object of the contract, rather than a strained or forced construction that leads to an absurd conclusion. Roller v. Stonewall Ins. Co., 115 Wash.2d 679, 801 P.2d 207 (1990); Transcontinental Ins. Co. v. WPUDUS, 111 Wash.2d 452, 760 P.2d 337 (1988).
In this case, the commercial property and B & M coverages apply to the same machines and both are issued by PEIC. The most reasonable interpretation of the combination policy held by Litho is to give effect to the offset provisions in each policy entitled "Insurance Under Two Or More Coverages." This reading serves the public policy against double recovery and gives the insured the benefit of his or her bargain, i.e., full recovery of its damage.
In sum, we find that the trial court did not have the authority to apportion the settlement amounts unilaterally. In so doing, the trial court could only speculate as to the value the parties attached to settled claims. Thus, HSB and PEIC were entitled to a complete offset in the amount of the settlement. Accordingly, the offset portion of the trial court's order is reversed, and we remand for entry of the judgment against the defendants which grants a full offset of the $335,000 settlement amount.
Litho's Breach of Contract Claim was Properly Dismissed.
Litho sued for performance of its insurance contract and for general breach of contract. The trial court subsequently dismissed the breach of contract claim as duplicative of Litho's efforts to enforce its insurance contract. Litho contends on appeal that the trial court's ruling barred it from pursuing consequential damages that are not covered under the policy or its endorsements.
The appellate court reviews a summary judgment ruling de novo. Dombrosky v. Farmers Ins. Co., 84 Wash.App. 245, 253, 928 P.2d 1127 (1996). The general rule regarding damages for an insurer's breach of contract is that the insured must be put in as good a position as he or she would have been had the contract not been breached. Kirk v. Mt. Airy Ins. Co., 134 Wash.2d 558, 951 P.2d 1124, citing, Greer v. Northwestern Nat'l Ins. Co., 109 Wash.2d 191, 202-03, 743 P.2d 1244 (1987).
The contract in dispute here does not provide for consequential damages. Nonetheless, Litho argues, without any supportive authority, that an insured's remedies for breach are not limited to the coverage stated in the policy. An argument will not be considered if it is inadequately briefed. State v. Wheaton, 121 Wash.2d 347, 365, 850 P.2d 507 (1993); Bohn v. Cody, 119 Wash.2d 357, 368, 832 P.2d 71 (1992); State v. Elliott, 114 Wash.2d 6, 15, 785 P.2d 440, cert. denied, 498 U.S. 838, 111 S.Ct. 110, 112 L.Ed.2d 80 (1990). Accordingly, we affirm the trial court's dismissal of this claim.
HSB's Motion for Judgment as a Matter of Law was Properly Denied.
A court may grant a motion for judgment *645 notwithstanding the verdict[1] when there is no competent evidence or reasonable inference that would sustain a verdict for the nonmoving party. McGreevy v. Oregon Mut. Ins. Co., 74 Wash.App. 858, 866, 876 P.2d 463 (1994), aff'd, 128 Wash.2d 26, 904 P.2d 731 (1995), citing, Hojem v. Kelly, 93 Wash.2d 143, 145, 606 P.2d 275 (1980). The court must accept the truth of the nonmoving party's evidence and draw all reasonable inferences in the light most favorable to the party against whom the motion is made. Douglas v. Freeman, 117 Wash.2d 242, 247, 814 P.2d 1160 (1991).
After the trial, HSB filed a Motion for Judgment as a Matter of Law or in the Alternative for a New Trial, claiming that Litho failed to prove that its claimed accidents resulted in physical damage necessitating repair or replacement. The trial court denied the motion and stated that the "jury awards were supported by substantial evidence."
As the facts above demonstrate, Litho presented, at best, only the slimmest of evidence to support their claim. Neither Michael Whiteman nor Jackie Ward could clearly identify specific physical damages to the machines nor demonstrate causation. However, their testimony was that the machines did not operate as well after the February 1992 incident, and that testimony did support the inference that the machines were damaged by that incident.
The jury was instructed that "[c]ircumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts may be reasonably inferred from common experience." And Question 7 of the Special Verdict Form asks, "[w]as direct damage to the Studio 910 or to the Scanner 636 caused by an `accident' in February 1992?" The jury answered "yes."
The court must accept the truth of the nonmoving party's evidence and draw all reasonable inferences in the light most favorable to the party against whom the motion is made. Douglas v. Freeman, 117 Wash.2d 242, 247, 814 P.2d 1160 (1991). Viewing the evidence in the light most favorable to Litho, we find that although its evidence was meager, we cannot say that there was "no competent evidence or reasonable inference that would sustain a verdict for the nonmoving party." McGreevy v. Oregon Mut. Ins. Co., 74 Wash.App. 858, 866, 876 P.2d 463 (1994), aff'd, 128 Wash.2d 26, 904 P.2d 731 (1995). Therefore, we must affirm the trial court's denial of HSB's Motion for Judgment as a Matter of Law.
The Trial Court Properly Set Aside the Jury's Award for Business Interruption.
Litho argues that the trial court erred when it granted HSB's Motion for Judgment as a Matter of Law setting aside the $156,240 jury award for business interruption due to the February 1992 incident. The trial court found that there was insufficient evidence to support an award in that amount, and the award was speculative in part.
It is error to grant a motion for judgment as a matter of law unless the court can say that when viewing the evidence in the light most favorable to the nonmoving party, there is neither evidence nor reasonable inference from evidence sufficient to sustain the verdict. Alpine Industries, Inc. v. Gohl, 30 Wash.App. 750, 756, 637 P.2d 998 (1981).
The jury award for business interruption was substantially the figure that the appellant sought. The proposed calculation was 123 days at $4,500 per day times 28%, which would have yielded $154,980. The jury award was $156,240. The appellant's calculation was based on days of loss beginning in October, at an averaged loss per day of $4,500. Once the jury hung on the question of a covered "accident" in October, the evidence could not sustain business interruption damages between the October and February incidents. The evidence presented would not sustain a verdict of this magnitude based on the February incident alone. Therefore, the *646 trial court properly set aside the award for business interruption.
The Trial Court Erred in Denying Litho's Post-trial Motion for an Award of Sales Tax.
The insurance coverage in this case clearly contemplated repair or replacement of covered property in the event of a covered accident. The jury determined that the February incident was a covered accident which caused $366,000 of damage. The jury was not instructed to add or include sales tax, and there is no evidence that it did so. The judge should have granted Litho's motion to add sales tax to the applicable portion of the jury's verdict. Accordingly, on this issue, the trial court is reversed.
The Trial Court Properly Denied Litho's Motion for Prejudgment Interest.
Washington trial judges have discretion to disallow prejudgment interest, and such denial is reviewed for abuse of discretion. Burnside v. Simpson Paper Co., 66 Wash.App. 510, 531, 832 P.2d 537 (1992); Colonial Imports v. Carlton Northwest Inc., 83 Wash.App. 229, 242-45, 921 P.2d 575 (1996).
Prejudgment interest is awardable
(1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reliance to a fixed standard contained in the contract without reference on opinion or discretion.
Kiewit-Grice v. State, 77 Wash.App. 867, 872, 895 P.2d 6 (1995), review denied, 127 Wash.2d 1018, 904 P.2d 299 (1995). A claim is liquidated if "the evidence furnishes data, which, if believed, makes it possible to compute the amount [owed] with exactness, without reliance on opinion or discretion." Prier v. Refrigeration Eng'g Co., 74 Wash.2d 25, 32, 442 P.2d 621 (1968).
Litho's claims depended upon opinions regarding whether equipment was damaged, whether equipment needed to be repaired or replaced, and what those remedial efforts might cost. The jury had to rely upon opinions to reach their verdict and there is no way to assess how the jury determined their award.
Likewise, PEIC and HSB could not have been able to determine the amount owed to Litho until the jury reached its verdict. We therefore find that this assignment of error is completely without merit and we affirm the trial court's denial of Litho's request for prejudgment interest.
The Trial Court Properly Granted HSB's Motion for Partial Summary Judgment, Thereby Dismissing the Bad Faith and CPA Claims.
Litho assigns error to the trial court's denial of its post-trial motion for summary judgment regarding its bad faith claim. Litho also assigns error to the court's subsequent grant of HSB's post-trial motion to dismiss Litho's bad faith claims.
The trial court's determination that HSB reinsured PEIC and had no contractual relationship with Litho is a finding of fact and will be upheld if supported by substantial evidence. Bering v. SHARE, 106 Wash.2d 212, 220, 721 P.2d 918 (1986), cert. denied, 479 U.S. 1050, 107 S.Ct. 940, 93 L.Ed.2d 990 (1987); Thorndike v. Hesperian Orchards, Inc., 54 Wash.2d 570, 575, 343 P.2d 183 (1959).
As stated in the facts above, Litho acquired the B & M coverage from PEIC for certain "objects" and for loss of income. Although PEIC issued the B & M endorsement, it was reinsured in full by HBS.
The general rule is that there is no privity of contract that would enable the original insured to bring an action against the reinsurer. See John Alan Appleman, Insurance Law and Practice, § 7694 at 529 (1976). See also Commercial Mut. Ins. Co. v. Detroit F & M Ins. Co., 38 Ohio St. 11, 43 Am.Rep. 413 (1882).
The reinsurance agreement establishes that there was an irrefutable insurer/reinsurer relationship between HSB and PEIC:

*647 The true intent of this Agreement being that the Reinsurer shall, in every case to which this Agreement applies and in the proportions specified herein, follow the fortunes of the Company.
"[F]ollow the fortunes" is a term of art in reinsurance, which provides PEIC the right to settle claims or waive defenses without the concurrence of HSB. See Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir.1992); Aetna Casualty & Sur. Co. v. Home Ins. Co., 882 F.Supp. 1328, 1346-47 (S.D.N.Y.1995).
Nonetheless, Litho claims that there was a contractual link between it and HSB. Litho attempts to substantiate this claim by pointing to various documents which indicate that the B & M coverage was separate from the commercial property coverage first issued by PEIC. Litho also argues that HSB's duty to PEIC, under the reinsurance agreement, to investigate claims and indemnify PEIC for related expenses, somehow creates a contract with Litho.
The fact that HSB was involved in handling Litho's claim does not detract from the substantial evidence showing that HSB was a reinsurer with no actual or intended direct contractual relationship with Litho. HSB acted pursuant to its reinsurance agreement with PEIC as an agent, not as a principal. Therefore, the trial court properly found that no privity existed between HSB and Litho.
Consequently, Litho does not have standing to sue HSB for bad faith or CPA violations. See Green v. Holm, 28 Wash.App. 135, 622 P.2d 869 (1981) (a third party not in privity with the insurer could not sue for breach of CPA duties); See also Tank v. State Farm Fire & Cas. Co., 38 Wash.App. 438, 446, 686 P.2d 1127 (1984) ("It has consistently been held an action for the insurance company's breach of its duty to exercise good faith is limited to the insured.") Furthermore, Litho released all bad faith and CPA claims when it settled with PEIC. Therefore, the trial court properly dismissed Litho's bad faith and CPA claims against HSB.
The Trial Court Properly Granted HSB's Motion to Deny Litho Attorney Fees.
In the trial court's order granting HSB's Motion to Deny Recovery of Attorney's Fees, the court specifically stated that the motion was granted "except as to any incidental attorneys fees reasonably incurred and ruled to be Supplementary Payments under the Insurance contract." Litho assigns error to this ruling and characterizes it as a denial of Litho's right to recover fees under Olympic Steamship Co. Inc. v. Centennial Ins. Co., 117 Wash.2d 37, 811 P.2d 673 (1991).
Litho goes on to claim:
Litho Color is automatically entitled to an award of its Olympic Steamship fees if the appellate court determines either that there is a contractual link between HSB and Litho Color, or that HSB is prevented from asserting lack of privity by the doctrines of waiver or estoppel.
Because it is unclear what the trial court's basis for the July 25, 1997 order was, the appellate court may restrict its analysis of this assignment of error to the question articulated by Litho above.
As we explained above, there is substantial evidence that HSB was a reinsurer with no actual or intended direct contractual relationship with Litho. HSB acted pursuant to its reinsurance agreement with PEIC, and therefore the trial court's finding that no privity existed between HSB and Litho should be affirmed. Thus, without finding privity between Litho and HSB, there is no basis for awarding Olympic Steamship fees.[2]
The Trial Court Erred in Awarding Litho Attorney Fees Based on the Supplementary Payment Provision of the Policy.
PEIC and HSB assign error to the trial court's award of $6,847.65 for supplementary payment benefits in its final judgment order.
First, Litho argues that the language of the contract provides for such an award. The "Supplementary Payments" provision of the B & M endorsement states:
*648 We will pay with respect to any claim or "suit" we defend: (3) All reasonable expenses incurred by you at our request to assist us in the investigation or defense of the claim or "suit" including actual loss of earnings up to $100 a day because of time off work....
The trial court acknowledged that the construction proposed by Litho was not likely contemplated by the parties to the contract. Rather, a supplementary payment provision typically applies to cases where the insurer is defending claims on behalf of the insured. Still, the trial court found that the supplementary payment provision above required the insurers to pay Litho $6,847.65 for costs that Litho incurred in the process of suing the insurers.
Courts must read each contract as an average person would read it without giving it strained or forced meaning. Mid-Century Ins. Co. v. Henault, 128 Wash.2d 207, 905 P.2d 379 (1995). The words used in a contract should be given their ordinary meaning unless the entirety of the agreement clearly demonstrates a contrary intent. Universal/Land Const. Co. v. City of Spokane, 49 Wash.App. 634, 745 P.2d 53 (1987).
Here, where the insured is suing the insurer, the supplementary payment provision cannot be reasonably construed to authorize the insured to compensation from the insurer for costs incurred. Such a construction clearly defies the intent of the parties.
Moreover, in the settlement agreement, Litho released PEIC from "all liability, claims, or causes of action for extracontractual damages including ... attorney fees and expenses incurred by Litho Color in pursuit of its claims ... as respects the entire policy including the boiler and machinery endorsement."
For the reasons above, we find that the award of attorney fees under the supplementary payment provision was in error and must be reversed.
Sanctions
RAP 10.3(a)(3) requires an appellant's brief to contain a concise statement of each asserted trial court error, together with the issues pertaining to the assignments of error. RAP 10.3(a)(4), (5) and RAP 10.3(b) require that reference to the relevant parts of the record must be included for each factual statement contained in the sections of the parties' briefs devoted to the statement of the case and to argument. RAP 10.4(f) provides that references to the record should designate the page and part of the record which supports each factual statement contained in the statement of the case and in the argument. And although not explicitly stated in RAP 10.3(a)(5), it is implicit in the rule that the citations to legal authority contained in the argument in support of a party's position on appeal should relate to the issues presented for review and should support the proposition for which such authority is cited.
Sanctions under RAP 10.7 may well be appropriate for counsel who neglect to meet the requirements of RAP 10.3. See, e.g., Hurlbert v. Gordon, 64 Wash.App. 386, 824 P.2d 1238, review denied, 119 Wash.2d 1015, 833 P.2d 1389 (1992). The purpose of these rules is to enable the court and opposing counsel efficiently and expeditiously to review the accuracy of the factual statements made in the briefs and efficiently and expeditiously to review the relevant legal authority. Hurlbert, 64 Wash.App. at 400, 824 P.2d 1238.
There were significant failures by Litho to comply with the Rules of Appellate Procedure. Litho initially filed an opening brief which was 173 pageswell in excess of the 50-page limit. RAP 10.4(b). The replacement brief was nearly 90 pages, plus a 25-page appendix. Litho later filed an errata sheet requiring this court to expend its resources in order to correct nine substantive error in its opening and reply briefs. Not all of the citations were corrected by the errata.
It was necessary for the court and for opposing counsel to track numerous factual statements through the massive record and to review all of the legal authority cited, as to all issues on appeal. In a case such as this one, with over three-hundred pages of briefing, over two-thousand pages of clerk's pages, nearly one-thousand pages of verbatim transcripts of proceedings and numerous *649 exhibits, failures to comply with the rules of appellate procedure exacts a heavy and unwarranted toll on the court's resources.
Accordingly, pursuant to RAP 10.7, we impose $500 in sanctions upon Litho's attorneys for this appeal, payable within 30 days, one-half payable to the court, one-half payable to PEIC. Attorney fees on appeal are not awarded to PEIC and HSB in the absence of a request for fees.
The case is remanded for proceedings consistent with this opinion.
BAKER, J., and AGID, A.C.J., concur.
NOTES
[1] Motions for a directed verdict and motions for judgments notwithstanding the verdict were renamed "motions for judgment as a matter of law" effective September 17, 1993. See Hizey v. Carpenter, 119 Wash.2d 251, 271-72,830 P.2d 646 (1992).
[2] Litho clearly anticipates this conclusion when it argues that this court should extend Olympic Steamship to apply to reinsurers on public policy grounds. We find no merit in that argument.