IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| DONALD CANFIELD, | ) | No. 67274-6-I |
| | ) | |
| Appellant/ | ) | |
| Cross-Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| MICHELLE CLARK and SEATTLE | ) | |
| PUBLIC SCHOOLS, | ) | |
| | ) | UNPUBLISHED OPINION |
| Respondents/ | ) | |
| Cross-Appellants. | ) | FILED: May 28, 2013 |
| | ) | |
| | ) | |

2013 MAY 28 AM 9: 52
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

BECKER, J. — Donald Canfield, an electrician with the Seattle Public
Schools, was demoted after the school district investigated a coworker's
allegation that Canfield carried a gun on school property. An arbitration resulted
in his reinstatement. His defamation suit against the coworker was dismissed on
summary judgment. We reverse that ruling. A reasonable jury could find that the
coworker made statements that were unprivileged and false. The dismissal of
Canfield's claims against the school district is affirmed.

FACTS

Canfield began working for the Seattle school district as a maintenance
electrician in 1992. He became foreman of the district's electrical shop in 2001.

Some of Canfield's subordinates complained that he had an intimidating manner, but Canfield was not disciplined.

In August 2007, the district hired Michelle Clark to work in the electrical shop as a fire alarm technician. Canfield suggested Clark for the position. Canfield had previously worked with Clark on electrical contract jobs, and they were social acquaintances. In early December 2007, Clark complained to Auki Piffath, her carpool partner from a different maintenance trade, about a particular incident when Canfield had gotten angry with her at work. Clark said she was concerned because she knew that Canfield carried a gun. She told Piffath that years before her employment at the school district, she had seen Canfield pull a gun from his pocket soon after he had walked off school district property.

Piffath reported Clark's statements to district management. The next day, a member of the human resources department, Jeanette Bliss, contacted Clark. Clark repeated her remarks about Canfield to Bliss. She added that Canfield, while at work, had recently confirmed that he was still carrying a gun.

Police were called to the school. Canfield was publicly escorted off school property by police officers. He was placed on paid administrative leave.

Bliss interviewed Canfield, Clark, and several other maintenance employees. Canfield insisted that he never brought a gun onto school property. Several employees told Bliss they were aware Canfield owned guns, but none reported seeing Canfield carrying a gun on school property. Bliss concluded Canfield had harassed his employees and created a hostile work environment.

2

She recommended that he be terminated. The district decided instead to demote him out of his foreman position. His pay was reduced, a written reprimand was added to his personnel file, and he was required to participate in anger management counseling.

Canfield's union filed a grievance on his behalf. After a two-day hearing in September 2009, the arbitrator sustained his grievance. The arbitrator found the school district's evidence had "certain significant defects," and Clark's initial gun allegation did "not appear to have had substance." The arbitrator lifted the demotion, awarded Canfield back wages, and converted the written reprimand to a documented oral warning, the lowest level of progressive discipline.

Canfield then sued Clark for defamation, outrage, and negligent infliction of emotional distress. Several months later, he filed a separate suit against the school district alleging retaliation, civil conspiracy, and a statutory wage claim, among other claims. The two lawsuits were consolidated, Clark and the school district were jointly represented, and both defendants moved for summary judgment. Canfield's claims against Clark and his wage claim against the district were dismissed. He was allowed to go to trial against the district on his claims of retaliation and civil conspiracy. After a nine-day trial in July 2011, the jury found for Canfield on the retaliation claim and awarded him $500,000. The trial court overturned the verdict on the school district's motion for judgment as a matter of law under Civil Rule 50. Canfield appeals.

3

DEFAMATION

Canfield contends the court erred by dismissing his defamation claim against Clark on summary judgment.

This court reviews summary judgment orders de novo, engaging in the same inquiry as the trial court. Mohr v. Grant, 153 Wn.2d 812, 821, 108 P.3d 768 (2005). Summary judgment is proper if the evidence shows there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. CR 56(c). Construing the evidence in the light most favorable to the nonmoving party, the court asks whether a reasonable jury could find in favor of that party. Mohr, 153 Wn.2d at 821.

Summary judgment "plays a particularly important role in defamation cases" because permitting unwarranted defamation suits to proceed to trial can chill speech protected by the First Amendment. Mohr, 153 Wn.2d at 821. Competing with these free speech concerns is society's "'pervasive and strong interest in preventing and redressing attacks upon reputation.'" Mohr, 153 Wn.2d at 821 n.5, quoting Rosenblatt v. Baer, 383 U.S. 75, 86, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966). The plaintiff in a defamation suit must prove falsity, an unprivileged communication, fault, and damages. Duc Tan v. Le, No. 86021-1, slip op. at 12 (Wash. May 9, 2013). To withstand summary judgment, the plaintiff must show a genuine dispute as to each element. Mohr, 153 Wn.2d at 822.

A. Falsity

In sworn testimony, Clark did not deny making statements to school district employees that she had seen Canfield carrying a gun on school property. She admitted telling several people about the long-ago incident when she claims she saw Canfield take a gun from his pocket soon after stepping off of district property. Bliss testified that Clark also told her that after she began working with Canfield at the school district, she once asked him if he still kept a gun on him, and that he responded by saying "yes," it was in his pants. Clark admitted telling Piffath and Bliss about seeing Canfield's gun cabinet at his house—in Bliss's notes of the interview, Clark called it "an arsenal."

Clark also admitted making statements about Canfield's gun possession to other school employees, including Jessie Logan and Bill Wickersham, while Canfield was on administrative leave. Logan's declaration reports that Clark definitely said she saw Canfield carrying a gun at school:

> She started talking to one of the teachers at an elementary school we went to about Don carrying a gun and having such a terrible temper. When I overheard this I asked Michelle, "Did you say that this guy, 'Don,' was carrying a gun on the school district's property?" She told me that he carried a gun and never took it off his body. I asked her if she ever actually SAW the gun on him at the school district shop and she told me, "Yes, I was in the electrical shop one day when he was there. I saw it on him." I was flabbergasted.
> From the way she was talking about him, I really believed he was a potential mass killer. Michelle explained what had happened in the electrical shop just months before I took the call. She said that "Don" went off on her and became very violent on the job, and that it took a SWAT team to remove him from the school district shop. She said that nobody could stand him (not even the teachers in the schools) and that everybody was just glad that he was gone and thanked her for "getting rid of him." She told me that "Don" was

5

currently on paid administrative leave while the school district could figure out a way to fire him.

(Emphasis added.) Although Clark testified that she believed Logan was exaggerating, she did not deny the substance of Logan's remarks. She admitted that until someone at the school district instructed her not to talk about Canfield's gun possession, she "didn't have an issue talking about it . . . . Don's name came up a lot, yes."

In his arbitration testimony, Canfield denied ever bringing a gun on school district property: "Never, never. Wouldn't think of it. . . . I know the laws. I have a concealed weapons permit." He also denied Clark's account of the incident from years before. Canfield testified that the outing in question was on a Saturday, Clark picked him up at his home and drove him to the store, they did not park on or enter school district property, and he decided to bring a gun with him for "protection" because the store was not in a good part of town. In his declaration filed in opposition to summary judgment, Canfield reaffirmed his arbitration testimony as being "true and correct." Canfield's insistence that he never carried a gun on school property creates a genuine dispute as to the truth or falsity of Clark's statements about him. See Lawson v. Boeing Co., 58 Wn. App. 261, 267, 792 P.2d 545 (1990) ("On summary judgment we must assume that the statements were false, since they are denied in [the plaintiff's] affidavit."), review denied, 116 Wn.2d 1021 (1991).

A defendant in a defamation case need not prove the literal truth of every statement, so long as the "gist" of the statements or the portion that carries the

6

"sting" is true and the false statements do not cause any separate or additional harm. Mohr, 153 Wn.2d at 825; Duc Tan, slip op. at 17-18. Clark contends her statements were all "substantially true" because they were all corroborated by the common understanding among electrical employees that Canfield habitually carried a gun.

Clark's argument fails. The "sting" of Clark's statements was not the mere fact that Canfield habitually possessed guns. Gun possession is generally a lawful activity. The portion that carried the "sting" and did harm to Canfield's reputation was the allegation that he carried guns with him *onto school property*. Such an action would violate state law, see RCW 9.41.280, as well as school district policy. It was this allegation that gave the school district grounds for having Canfield escorted off of school property by armed police, for placing him on an indefinite period of administrative leave, and for investigating him over a period of several months.

Bliss's interview notes recorded a statement that "Anyone who knows Don knows that he carries his gun everywhere he goes." Clark also cites the declarations of Piffath, Bill Wickersham, and Jeff Hilliard to show that it was common knowledge Canfield carried a gun on school property. This evidence amounts to little more than vague reports of hearsay by unnamed coworkers. The declarations provide no personal knowledge that Canfield ever carried a gun on school property. Bill Wickersham was the only one who actually saw Canfield with a gun, but Wickersham was indefinite as to when or where this occurred.

Clark's argument that her remarks were all "substantially true" also fails because at her deposition, she admitted the statement she made to Logan was false.

> Q: . . . Did you ever – during the time that you worked at the school district, did you ever see Mr. Canfield carrying a gun on school property?
> A: No.
> Q: Did you ever ask him, Mr. Canfield, if he had a gun on school property during the time that you worked there?
> A: I don't know. I don't remember.
> Q: Okay. Do you ever recall Mr. Canfield showing you a gun on his person while he was working at Seattle School District during the time you worked there?
> A: No.
>
> . . . .
> Q: . . . *Is this a false statement: That you saw Mr. Canfield carrying a gun on his person while working at Seattle Public Schools during the time you were employed there?*
>
> . . . .
> A: *That would be a false statement.*

(Emphasis added.)

B. Privilege

A conditional or qualified privilege can attach to otherwise slanderous statements made to a third person "who has a common interest in the subject and is reasonably entitled to know the information." Pate v. Tyee Motor Inn, Inc., 77 Wn.2d 819, 820-21, 467 P.2d 301 (1970); see also Corbally v. Kennewick Sch. Dist., 94 Wn. App. 736, 973 P.2d 1074 (1999). Although the common interest privilege has been applied to communications between employees, the privilege is lost if the statements go beyond the ordinary course of the employees' work. Doe, 143 Wn.2d at 703.

Piffath was a union steward for the school district. Clark claims her statement to Piffath was privileged because she was reaching out for help from someone whose job it was to be concerned. A jury, however, would not have to accept this characterization of Clark's motivations. Clark testified that she talked to Piffath because he was her carpool partner. Piffath confirmed his belief that Clark's remarks about Canfield were made in the course of "just casual conversation" during the commute home, and not as a report related to her employment with the school district.

Also, a conditional privilege may be abused and its protection lost if the person made the statement with knowledge of—or by exercising reckless disregard for—the probable falsity of the defamatory matter. Hitter v. Bellevue Sch. Dist. No. 405, 66 Wn. App. 391, 401, 832 P.2d 130, 120 Wn.2d 1013 (1992); Duc Tan, slip op. at 20. Even if a privilege did apply to Clark's remarks to Piffath, a jury could conclude she lost it through abuse if the stories she told were knowingly false or told with a reckless disregard for its probable falsity. As to the story from years before that Clark relayed to Piffath, the record presents numerous variations. Canfield adamantly refutes Clark's version. This dispute calls into question the veracity of the version Clark recounted to Piffath. It is a credibility question for a jury to decide whether Clark's version was false, knowingly false, or told with a reckless disregard for its probable falsity.

Clark's reports to Bliss and other individuals in management arguably could invoke the common interest privilege. Bliss was a member of the human

9

resources department charged with addressing employee concerns. An employee's complaints that a supervisor is intimidating employees and carrying a gun to school is plainly a matter of common interest to the school district.

But the possibility of abuse hovers around certain of Clark's statements to Bliss as well. Clark told Bliss about the contested incident from years before which, as discussed above, could have been a knowingly false statement. Clark also told Bliss about a conversation when Canfield allegedly told Clark he was carrying a gun at work "in his pants." Whether such a conversation with Canfield ever occurred must be left to a jury, given Clark's inconsistent testimony on cross-examination concerning these remarks and Canfield's denial. Cf. Lambert v. Morehouse, 68 Wn. App. 500, 506-07, 843 P.2d 1116 (a person who complains about harassment necessarily has knowledge of whether the complaints are true or false), review denied, 121 Wn.2d 1022 (1993). Because Clark described statements she claims she heard Canfield make and actions she claims she saw Canfield take, if her reports were false, they were knowingly false. In such a case, whether she abused a privilege is an issue of fact for the jury, which must decide whether or not Clark was telling the truth. Lambert, 68 Wn. App. at 507.

In any event, no privilege applied to Clark's remarks to her coworker Logan. Logan had nothing to do with Canfield's investigation or the disciplinary process. Logan had never met Canfield when she heard Clark talk about seeing Canfield with a gun in the electrical shop. A jury could find that these remarks by

10

Clark were not within the ordinary course of Clark's and Logan's electrician work.

C. Fault

If Canfield is a private individual, he must demonstrate that Clark made her false statements negligently. Hitter, 66 Wn. App. at 400. If Canfield is a public figure, he must demonstrate by clear and convincing evidence that Clark made her remarks with actual malice. Corbally, 94 Wn. App. at 741; Duc Tan, slip op. at 20. Whether the plaintiff is a private individual or a public figure is a question of law for the court to decide. Valdez-Zontek v. Eastmont Sch. Dist. 154 Wn. App. 147, 159, 225 P.3d 339 (2010). Clark contends Canfield is a public figure since he held a position of authority in the electrical shop and he worked for a public entity. She cites Corbally, where the court ruled a public school teacher was a public official for purposes of his defamation lawsuit since his conduct "involved the manner in which he performed his teaching duties pursuant to public contract." Corbally, 94 Wn. App. at 741.

We need not now resolve whether or not Canfield should be deemed a public or private figure. Even if Canfield is held to the higher fault standard of actual malice, he has shown a genuine dispute of fact as to Clark's fault. As noted above, Clark admitted that at least one of the statements reported by Logan was false. If so, it was "unquestionably knowingly false." Lawson, 58 Wn. App. at 267. At trial, the court will decide as a threshold matter whether Canfield was a private individual or a public figure.

D. Damages

That Canfield suffered damages is undisputed in this appeal. Damages for emotional distress are available in defamation suits. Cagle v. Burns & Roe, Inc., 106 Wn.2d 911, 915-18 & n.1, 726 P.2d 434 (1986).

Having raised a genuine dispute of fact as to the challenged elements of defamation, Canfield is entitled to a jury trial.

Canfield also assigns error to the court's summary judgment dismissal of his outrage claim against Clark. He advances no argument as to that claim in his briefs, however. We treat this assignment of error as abandoned.

PREVAILING WAGE ACT

Canfield made a wage claim against the district based on chapter 39.12 RCW, commonly referred to as the prevailing wage act. He appeals the summary dismissal of this claim. The issue raised is one of statutory interpretation, which we review de novo. Litchfield v. KPMG, LLP, 170 Wn. App. 431, 437, 285 P.3d 172 (2012).

As a regular employee of the school district, Canfield sometimes worked on school building projects alongside workers hired by private contractors. Such contractors are required to pay the prevailing hourly wage to the "laborers, workers, or mechanics" they hire to perform under contracts. RCW 39.12.020. Canfield complained to the district on various occasions that he and his crew were likewise entitled to receive the prevailing wage when they collaborated on

these projects with the private laborers.

The statute expressly excludes regular public employees from its coverage:

> The hourly wages to be paid to laborers, workers, or mechanics, upon all public works and under all public building service maintenance contracts of the state or any county, municipality or political subdivision created by its laws, shall be not less than the prevailing rate of wage for an hour's work in the same trade or occupation in the locality within the state where such labor is performed. . . .
>
> . . . .
>
> *This chapter shall not apply to workers or other persons regularly employed by the state, or any county, municipality, or political subdivision created by its laws.*

RCW 39.12.020 (emphasis added).

Canfield's brief makes a policy argument that the school district "should not be allowed to circumvent the laws by allowing contractors on public works projects to utilize its employees," and thereby avoid paying the higher prevailing wage. This hint at some type of conspiracy to lower wages finds no clear support in the record. Nor is it supported by any citation to legal authority. Canfield's other arguments on this issue are similarly unsupported. The language of the statute unambiguously defeats them. The trial court did not err in dismissing the prevailing wage claim.

## RETALIATION CLAIM

The only claims by Canfield that went to the jury were his claims of retaliation and civil conspiracy against the district. Canfield alleged, in essence, that the gun investigation was a sham concocted to retaliate against him for

13

complaining that he and his workers should be paid prevailing wages.

The school district moved for summary judgment on the retaliation claim on the basis that no Washington statute protects employees from retaliation for complaining about prevailing wages. Under CR 50, the district moved again for dismissal of the claim at the close of Canfield's evidence. The trial court denied the motion and allowed the jury to deliberate. The jury brought in a verdict for Canfield on the retaliation claim and awarded him $500,000. The district then renewed the CR 50 motion. The trial court granted the motion, leaving Canfield with no recovery. Canfield appeals this ruling.

The issue comes to us on a stipulated record that contains an excerpted transcript of the colloquies on the CR 50 motion and its renewal. The appellate record does not contain a transcript of the trial itself.

The Minimum Wage Act, chapter 49.46 RCW, is the only Washington wage statute containing an express anti-retaliation provision. The Minimum Wage Act makes an employer guilty of a gross misdemeanor "who discharges or in any other manner discriminates against any employee because such employee has made any complaint to his or her employer . . . that he or she has not been paid wages in accordance with the provisions of this chapter." RCW 49.46.100(2).

Canfield argues that the anti-retaliation provision of the Minimum Wage Act is equally applicable to workers who make wage complaints under other wage statutes, such as the prevailing wage act. The trial court correctly rejected

14

this interpretation of the statute. The court's primary purpose in interpreting a statute is to ascertain and give effect to the legislature's intent. Litchfield, 170 Wn. App. at 437. If a statute's meaning is plain on its face, the court gives effect to that plain meaning. Litchfield, 170 Wn. App. at 437.

The anti-retaliation provision in the Minimum Wage Act specifies that the wage complaints protected from retaliation are complaints that a worker has "not been paid wages *in accordance with the provisions of this chapter.*" RCW 49.46.100 (emphasis added). Complaints related to prevailing wage entitlements under RCW 39.12.020 fall outside that limiting language.

Other statutes relating to employment contain specific language protecting against retaliation. See, e.g., RCW 51.48.025(1); RCW 49.60.210; and RCW 41.80.110(1)(d). The legislature could have easily included such language in the prevailing wage act, but it did not. Individual provisions of the Minimum Wage Act cannot be parceled out and exported into other statutes in entirely separate titles of the RCW. The function of the Minimum Wage Act is to establish the minimum wage and minimum standards of employment. See Seattle Prof'l Eng'g Emps. Ass'n v. Boeing Co., 139 Wn.2d 824, 835, 991 P.2d 1126, 1 P.3d 578 (2000). The prevailing wage act has a different function. The trial court correctly concluded that Canfield's claim of retaliation lacked a statutory basis.

CIVIL RULE 50

The judge who presided over the trial of the retaliation claim, and then granted the CR 50 motion, was not the same judge who denied the district's

15

pretrial motion for summary judgment on the same legal issue. Canfield contends the decision of the first judge must be given effect, and the judge who presided over the trial lacked authority to reach a different conclusion about the meaning of the various statutes. We disagree. A transfer of judges has no legal effect, and an interlocutory decision can be corrected by a different judge before a final judgment is rendered.

> [T]he succession of judges cannot be considered by this court; the office is a continuing one; the personality of the judge is of no legal importance. The action of [a subsequent judge, reversing his predecessor's ruling] was in legal effect a correction of his own action, which he deemed to have been erroneous; and it were far better that he should correct it, than to perpetuate an error which would have to be corrected by this court.

Shephard v. Gove, 26 Wash. 452, 454, 67 P. 256 (1901).

Canfield also argues it was procedurally inappropriate for the court to decide the validity of the retaliation claim under CR 50. He contends CR 50 motions are confined to situations where the evidence at trial is factually insufficient and that it may not be used to decide that a claim is legally insufficient.

Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816 (1997). Often, the question concerns the sufficiency of the evidence viewed in the light most favorable to the nonmoving party. But the

reach of CR 50 is not confined to factual insufficiency. "A judgment as a matter of law may also be appropriate when, instead of the evidence being insufficient, the plaintiff's right to recovery (or the defendant's defense) is barred by a statute or other applicable law." 4 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE CR 50 author's cmt. 1, at 213 (6th ed. 2013). The rule permits a party to move for judgment *as a matter of law* where "there is no *legally sufficient* evidentiary basis for a reasonable jury" verdict. CR 50(a)(1) (emphasis added). There cannot be a legally sufficient evidentiary basis to support a nonexistent statutory claim.

In that sense, the district's CR 50 motion did ultimately rest on an argument that Canfield's evidence was insufficient. A statutory claim of retaliation under the Minimum Wage Act would have required evidence that Canfield complained about not receiving minimum wages or overtime. Canfield's only complaints were about not receiving the prevailing wage.

The court's instructions informed the jury that a worker has a valid claim for retaliation based on making a complaint about prevailing wages. Canfield argues in his reply brief on appeal that the court's CR 50 ruling dismissing that claim was legal error because it contradicted the law as stated in the jury instructions. Once the court read the instructions to the jury, he contends, the school district lost its right to raise purely legal challenges.

This argument was raised too late. "An issue raised and argued for the first time in a reply brief is too late to warrant consideration." <u>Cowiche Canyon</u>

17

Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). The jury instructions were not made part of the record on appeal until the day after Canfield filed his reply brief. The record is also incomplete. The school district's proposed instructions and the jury instruction colloquy were never made part of the record on appeal.

A reply brief is limited "to a response to the issues in the brief to which the reply brief is directed." RAP 10.3(c). The district correctly notes that Canfield's inclusion of a new argument in his reply brief, and his belated attempt to submit the jury instructions for our review, are violations of the appellate rules. To that extent, we grant the district's motion to strike. This ruling affords the district sufficient redress for the rule violations. Its request for sanctions is denied.

Canfield's new argument would fail on the merits even if it could be considered. Jury instructions, once announced by the court, become the "law of the case." Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 917, 32 P.3d 250 (2001). But the law as pronounced in the jury instructions is not binding on questions of law raised later in a motion for a directed verdict. Kim v. Dean, 133 Wn. App. 338, 349, 135 P.3d 978 (2006); Rhoades v. DeRosier, 14 Wn. App. 946, 948 n.2, 546 P.2d 930 (1976). "Whether a verdict should have been directed is a question of law, and its resolution is not controlled by the pronouncements of the instructions, but by the *applicable* law." Rhoades, 14 Wn. App. at 948 n.2. This same rationale controls where, as here, the question of law is raised in a CR 50 motion for judgment as a matter of law. Motions for directed

verdict and motions for judgment notwithstanding the verdict were renamed "'motions for judgment as a matter of law'" effective September 17, 1993. Guijosa,144 Wn.2d at 915, quoting Litho Color, Inc., v. Pac. Emp'rs Ins. Co., 98 Wn. App. 286, 298 n.1, 991 P.2d 638 (1999).

Canfield claims that a CR 50 ruling cannot undo the law set forth in jury instructions to which no objection was made, relying for this proposition on Washburn v. City of Federal Way, 169 Wn. App. 588, 283 P.3d 567 (2012), review granted, 176 Wn.2d 1010 (2013). But Washburn is not on point because this court disregarded the CR 50 argument as not preserved. Washburn, 169 Wn. App. at 592, 614.

We reverse summary judgment as to the defamation claim. In all other respects, the judgment of the trial court is affirmed.

Becker, J.

WE CONCUR:

Spearman, A.C.J.

Appelwick, J.

19