[No. 44941-9-I.   Division One.   October 2, 2000.]

PUGET SOUND ENERGY, INC., *Appellant*, v. ALBA GENERAL INSURANCE COMPANY, ET AL., *Respondents*.

---

684

*Charles C. Gordon, James R. Murray,* and *Jeffrey I. Tilden* (of *Gordon Murray Tilden*); and *David M. Brenner* (of *Riddell Williams Bullitt & Walkinshaw*), for appellant.

*R. Lind Stapley* and *Steven Soha* (of *Soha & Lang, P.S.*); *Robert L. Israel* and *Linda B. Clapham* (of *Lane Powell Spears Lubersky, L.L.P.*); *Curt H. Feig* (of *Cozen and O'Connor*); and *Tyna L. Ek* (of *Merrick, Hofstedt & Lindsey*), for respondents.

AGID, C.J. — Puget Sound Energy, Inc. (PSE) filed a declaratory judgment action against a number of its insurers to establish their liability for PSE's costs of remediation at six environmentally contaminated Washington sites. The trial court dismissed the majority of PSE's claims against the insurers on summary judgment, concluding that PSE had admitted it was adequately compensated by prior settlements with its other insurers for its known past and future remediation costs at the sites. The sole question on appeal is whether there are disputed issues of fact about the adequacy of the compensation PSE has received.

We hold that the trial court should not have dismissed the claims against PSE's third-party insurers because PSE has produced settlement agreements establishing that some of the money it has received from other insurers was paid for remediation at sites not at issue here. PSE should have the opportunity on remand to demonstrate that some of these proceeds either have been or will be allocated to these other sites. We affirm the trial court's order dismissing claims against the first-party insurers because PSE failed to meet its summary judgment burden of identifying disputed facts on the issue whether there is property damage on the Everett, Chehalis, or "A" Street sites for which it has not been fully compensated.[1] We therefore reverse and remand PSE's claims against the third-party insurers and affirm the order granting the first-party insurers' motions for summary judgment.

## FACTS

In November 1997, PSE filed a complaint for declaratory relief and money damages against a number of its first-

---

[1] The first-party policies cover only physical damage incurred at the Everett, Chehalis, and A Street sites between 1979 and 1985.

party and third-party insurers claiming coverage for its environmental liabilities at six Washington sites: Chehalis, Everett, 22nd and A Street in Tacoma, Thea Foss Waterway, Gas Works Park, and Quendall Terminals. Contending that PSE admitted in various documents that it had fully recovered insurance proceeds for past cleanup costs at the sites and obtained and allocated additional insurance funds exceeding all projected future cleanup costs at the same sites, the insurers sought to dismiss PSE's claims on summary judgment. They based their argument on three documents authored primarily by Steven Secrist, PSE's Director of Environmental Services and Assistant General Counsel. These documents are PSE's answers to the insurers' requests for admission, PSE's 1998 annual 10-K report to the Securities and Exchange Commission (SEC), and a letter PSE sent to the Washington Utilities and Transportation Commission (WUTC) on February 26, 1999.

Requests for Admission

In their requests for admission, the insurers posed questions about PSE's cost estimates and recoveries as of December 1997:

> **REQUEST FOR ADMISSION NO. 1:** Admit that the following statement was made in PSE's Form 10-K Annual Report pursuant to the Securities Exchange Act of 1934, for the fiscal year ending December 31, 1997:
>
>> Five former WNG or predecessor companies manufactured gas plant ("MGP") sites are currently undergoing investigation, remedial actions or monitoring actions relating to environmental contamination: 1) Everett, Washington; 2) "Gas Works Park" in Seattle, Washington; 3) "Tacoma 22nd and A St." Site in Tacoma, Washington; 4) Chehalis, Washington; and 5) and "Tideflats" area of Tacoma, Washington. Costs incurred to date total approximately $48.0 million and currently estimated future remediation costs are approximately $7.7 million. To date, the Company has recovered approximately $55.7 million from insurance carriers.
>
> **ANSWER:** Admitted.

**REQUEST FOR ADMISSION NO. 2:** Admit that by December 31, 1997, PSE had incurred approximately $48 million in costs for investigation, remedial actions or monitoring actions relating to environmental contamination at the following manufactured gas plant sites: 1) Everett, Washington; 2) "Gas Works Park" in Seattle, Washington; 3) "Tacoma 22nd and A St." Site in Tacoma, Washington; 4) Chehalis, Washington; and 5) the "Tideflats" area of Tacoma, Washington.

**ANSWER:** Denied. PSE admits that, as of December 31, 1997, it had incurred approximately $40.6 million in costs for investigation, remedial action or monitoring actions relating to environmental contamination at the listed sites. The $48 million figure cited in PSE's form 10-K Annual Report for the year ending December 31, 1997 included the costs of insurance coverage litigation and the costs of pursuing recoveries from other potentially liable or responsible parties.

**REQUEST FOR ADMISSION NO. 3:** Admit that by December 31, 1997, PSE estimated future remediation costs to be approximately $7.7 million for actions relating to environmental contamination at the following manufactured gas plant sites: 1) Everett, Washington; 2) "Gas Works Park" in Seattle, Washington; 3) "Tacoma 22nd and A St." Site in Tacoma, Washington; 4) Chehalis, Washington; and 5) the "Tideflats" area of Tacoma, Washington.

**ANSWER:** Admitted.

**REQUEST FOR ADMISSION NO. 4:** Admit that by December 31, 1997, PSE had recovered approximately $55.7 million from insurance carriers for actions relating to environmental contamination at the following manufactured gas plant sites: 1) Everett, Washington; 2) "Gas Works Park" in Seattle, Washington; 3) "Tacoma 22nd and A St." Site in Tacoma, Washington; 4) Chehalis, Washington; and 5) the "Tideflats" area of Tacoma, Washington.

**ANSWER:** Denied. PSE admits that as of December 31, 1997, PSE has recovered approximately $55.1 million in compensation from all sources, including insurance carriers and others, in connection with actions relating to environmental contamination at sites including the listed sites. The total sum of $55.1 million included approximately $47.6 million from insurance carriers, approximately $5.9 million from non-insurer third parties that were liable to PSE in contribution

and/or indemnity, and approximately $1.6 million in the form of a tax refund that resulted from the expenses associated with the listed sites.

## SEC 10-K Filing

Secrist explained in his declaration that for purposes of financial disclosure, he periodically estimates combined past and future costs for various manufactured gas plant sites previously or currently owned by PSE. In the 1998 10-K SEC filing PSE stated:

> GAS SITES: Five former WNG or predecessor companies manufactured gas plant ("MGP") sites are currently undergoing investigation, remedial actions or monitoringactions [sic] relating to environmental contamination: 1) Everett, Washington; 2) "Gas Works Park" in Seattle, Washington; 3) "Tacoma 22nd and A St." Site in Tacoma, Washington; 4) Chehalis, Washington; and 5) the "Tideflats" area of Tacoma, Washington. Legal and remedial costs incurred to date total approximately $50.9 million and currently estimated future remediation costs are approximately $7.0 million. Work at both the Chehalis and Tideflats sites is substantially completed. To date, the Company has recovered approximately $59 million from insurance carriers and other third parties. Based on all known facts and analyses, the Company believes it is not likely that the identified environmental liabilities will result in a materialadverse [sic] impact on the Company's financial position, operating results or cashflow [sic] trends.

## Filing with the Washington Utilities and Transportation Commission

Finally, PSE's Deferred Environmental Cost Summary filed with the WUTC delineates the past and future costs of remediation at several sites as of December 1998, including the five at issue here:

| | |
|---|---|
| Everett: | $985,610.54 past, $2,271,253.66 future |
| Chehalis: | $1,748,384.90 past, $251,615.10 future |
| Gas Works: | $865,025.46 past, $2,611,647.92 future |
| A Street: | $263,113.69 past, $440,909.31 future |
| Thea Foss: | $457,630.82 past, $1,342,915.20 future |

## The Summary Judgment Orders

The trial court agreed with the insurers that these representations established that PSE had already recovered sufficient funds to satisfy its known environmental costs at the six sites. In the first of three summary judgment orders, the court dismissed all claims against the first-party property insurers at the Everett, Chehalis, and A Street sites with prejudice. In its second order, the court dismissed with prejudice all claims against the third-party insurers on the Everett, Chehalis and A Street sites and the first $3.2 million spent on defense and remediation of the Gas Works Park site. But because there is continuing damage at Gas Works Park, the court dismissed claims for future costs exceeding $3.2 million without prejudice. The third partial summary judgment order related solely to the Thea Foss site. There, the court dismissed with prejudice all past and future claims against the third-party insurers up to $1.5 million, but found unripe all other claims against the insurers at this site and dismissed them without prejudice.[2] On appeal PSE contends that because it has not admitted it will be made whole by these recoveries and the record raises issues of fact about its future costs, it is entitled to maintain this action.

## DISCUSSION

■ PSE first contends that the trial court erred by relying on low-end cost projections to determine PSE's total remediation responsibilities. PSE asserts that it has "historically and consistently" estimated a range of cost projections for remediation of the Thea Foss Waterway and Gas Works Park sites that "attempt to account for various uncertain factors at those sites which are still in a particu-

---

[2] After these three partial summary judgment orders, the only remaining site in the case was Quendall Terminals. Recognizing that "[b]y dollar volume and significance to the parties, the majority of this case has now been dismissed," the court stayed proceedings on that site pending this appeal.

larly fluid stage of development."[3] In its 10-Ks and Annual Reports, however, PSE reported the lower figure for both sites. It did so because an applicable accounting rule, Interpretation No. 14 of the Financial Accounting Standards Board, directs that "[w]hen no amount within the range is a better estimate than any other amount . . . the minimum amount in the range shall be accrued." PSE argues that if it had used the high-end costs on these two sites in its reports, its total remediation costs would have been $3.8 million higher, thus exceeding its reported recoveries. But even assuming PSE is correct, its argument fails because its claims on the only two sites for which a range was used, Thea Foss and Gas Works, were dismissed without prejudice for any costs exceeding $1.5 million and $3.2 million, respectively.[4] Thus, nothing prevents PSE from bringing claims against these insurers if its expenses at these sites ultimately exceed the low-end projections. Because PSE will be permitted to demonstrate that the high-end figure was more accurate when and if this becomes the case, the trial court did not err in relying on documents that cited the low-end figures.

■ ■ PSE next contends that because some of the $13,132,500 in settlement proceeds other insurers have paid were given in exchange for releases on *other* sites, summary judgment was inappropriate. With respect to PSE's third-party insurers, we agree. PSE has acknowledged, and the insurers do not dispute, that it has collected $13,132,500 from eight different insurers in settlement proceeds relating to the sites at issue here.[5] The insurers take this total recovery amount of $13,132,500, subtract

---

[3] A January 2, 1998 memorandum from Secrist reflects that the total project estimate for Thea Foss Waterway is $1,500,000 - $3,500,000, and for Gas Works Park, is $3,200,000 - $5,000,000. Secrist, who made these predictions, points out that he "considered both the low end and the high end to be equally reasonable projections at the time [he] made them."

[4] We agree with the trial court's decision to dismiss without prejudice claims for amounts beyond which current remediation methods cannot be estimated, but note that these amounts may change on remand.

[5] As reflected in PSE's 1998 10-K Annual Report, PSE's total insurance recoveries for all of its former manufactured gas plant sites amount to approxi-

$11,055,426—the past and future remediation costs PSE reported to the SEC on these five sites—and conclude that "PSE admits to having received a surplus of over $2 million in insurance proceeds over and above its already incurred and estimated future costs at the five sites in this appeal."[6] However, as is apparent from the settlement agreements in the record, at least some of this $13,132,500 was paid in consideration for release of claims on sites not at issue here.

For example, American Home contributed $9 million of the $13,132,500 settlement proceeds, but PSE's settlement agreement with American Home reflects that this amount was paid, at least in part, for present and future remediation on the Commencement Bay, Mercer Street headquarters, and Georgetown warehouse sites. This is not inconsistent with PSE's answers to the insurers' requests for admission, which state that PSE received the settlement money "in connection with actions relating to environmental contamination at sites *including* the listed sites."[7] PSE is correct that if the $13,132,500 were attributed solely to these five sites, the releases it gave to other insurers for other sites would have no value. That is an unreasonable assumption. These settlement agreements create disputed issues of fact about how much of recoveries from other insurers has been or will be allocated to the sites at issue in this case. On remand, PSE may establish that some of these funds have been or will be used for remediation of sites such as Mercer Street, Georgetown, and Commencement Bay. If it can do so, it may also be able to prove that it has not yet been made whole and is entitled to recover from the third-party insurers who are parties to this appeal.

On remand, the trial court will have to address the parties' arguments about whether the insurer or the insured bears the burden of allocating settlement proceeds. PSE concedes that it has not allocated the proceeds among

---

mately $59,000,000 as of December 31, 1998. But most of this was for the River Street site, the subject of previous litigation.

[6] (Emphasis omitted.)

[7] (Emphasis added.)

the released sites, but argues that the burden at trial of establishing a double recovery under *Pederson's Fryer Farms, Inc. v. Transamerica Insurance Co.*[8] is on the nonsettling insurance companies. The insurers assert that this court's recent decision in *Litho Color, Inc. v. Pacific Employers Insurance Co.*[9] directs that insurers are entitled to a 100 percent offset of settlement proceeds when a policyholder fails to allocate proceeds from a settlement agreement that releases multiple claims. In our view, neither case is particularly helpful in resolving the allocation dispute in this case.

In *Pederson's Fryer Farms*, Pederson's sought insurance coverage for cleanup of contamination caused by an underground gasoline storage tank. After two of Pederson's insurers settled for $32,000, Pederson's sued Transamerica, its only nonsettling insurer, to recover costs expended in the cleanup. The jury found in favor of Pederson's. On appeal, Division Two considered Transamerica's argument that the trial court erred in refusing to reduce the judgment against Transamerica by the amount Pederson's collected from the other insurers, and that without an offset, Pederson's would receive an inappropriate " 'double recovery' "[10] The court rejected this argument:

> The settlement . . . was not mere payment for Pederson's cleanup costs; it was in exchange for a release of liability for all past, present and future environmental claims. Transamerica did not demonstrate what part, if any, of the settlement was attributable to cleanup costs. Thus, no showing of double recovery was made. The trial court acted appropriately by not reducing the award.[11]

According to *Pederson's Fryer Farms*, then, the insurer seeking an offset for amounts paid in exchange for past,

[8] 83 Wn. App. 432, 451, 922 P.2d 126 (1996), *review denied*, 131 Wn.2d 1010, 932 P.2d 1255 (1997).

[9] 98 Wn. App. 286, 991 P.2d 638 (1999).

[10] 83 Wn. App. at 452 (quoting *Platts v. Arney*, 50 Wn.2d 42, 309 P.2d 372 (1957)).

[11] *Id.*

future, and present remediation costs bears the burden of proving the insured has already been made whole by prior settlements.[12] PSE believes this rule is appropriate because the insurer is the party seeking to avoid what would otherwise be its contractual obligation to cover the loss. The insurers counter that the rule makes no sense because the policyholder is in the best position to make such an allocation, but has absolutely no incentive to do so because in the absence of an allocation there will be no offset. We agree that when faced with a policyholder's clear refusal to allocate settlement proceeds, an insurer cannot be required to do so because only the policyholder has the critical information.

The insurers rely on *Litho Color*, a more recent decision by this court, to support their argument that they are "entitled to a 100% offset of settlement proceeds when a policyholder fails to fulfill its burden to allocate those same proceeds in a settlement agreement that releases multiple claims." In that case, Litho Color purchased a commercial property insurance policy from Pacific Employers Insurance Company (PEIC) that included a boiler and machinery (B&M) endorsement. This B&M endorsement was later "reinsured in full" by Hartford Steam Boiler Inspection and Insurance Company (HSB). After sustaining property damage, Litho asserted coverage claims against PEIC and HSB under both the commercial property coverage and the B&M endorsement. Before trial, Litho settled with PEIC for $335,000, which was intended as a release of Litho's contract, bad faith, attorney fee and statutory claims under the commercial property coverage. In this agreement, according to the court, Litho "clearly chose not to allocate portions of the settlement amount to specific causes of action."[13]

The settlement agreement reserved Litho's claims against PEIC and HSB under the B&M endorsement, and Litho proceeded to trial on those claims. The jury awarded

---

[12] *Pederson's* cites no authority for this proposition.

[13] 98 Wn. App. at 295.

Litho $366,000 under the endorsement. The trial court offset $193,000 of the verdict based on its own allocation of the settlement proceeds Litho had received from PEIC. On appeal, Litho assigned error to the trial court's grant of a partial offset, while HSB argued that the trial court should have awarded an offset for the full settlement amount. This court agreed with HSB, concluding that because "the trial court did not have the authority to apportion the settlement amounts unilaterally" and "could only speculate as to the value the parties attached to settled claims . . . HSB and PEIC were entitled to a complete offset in the amount of the settlement."[14]

Although *Litho Color* provides some support for the insurers' argument that the policyholder bears the burden of allocating settlement proceeds, its rather limited holding is not easily extended to the facts here. In *Litho Color*, the policyholder sought separate recovery under two forms of coverage for a single loss, the scope of which was established at the time the policyholder entered into the initial settlement agreement.[15] Because, in that case, any ambiguity in the settlement agreement resulted from the settling parties' failure to clearly articulate the injury each specific allocation was intended to compensate, the court could not be sure, without awarding a full offset, that the policyholder would not receive a double recovery for the same property damage. Here, in contrast, PSE received settlement proceeds for a release of claims for past and future damages at certain sites, some of which are not at issue here and some of which may require extensive future remediation that cannot be estimated now. To read *Litho Color* as requiring a full offset of the settlement proceeds in this situation would be unjust. We cannot infer from the record that PSE intends to remain indefinitely ambiguous about its intended settlement allocation in an effort to trick

---

[14] *Id.* at 297.

[15] As we noted, "[u]nder Litho's proposed reading of the policies, Litho could recover the full payment of all the physical damage to its machines under each coverage separately." *Id.* at 296.

its insurers into providing more money than PSE actually needs to perform the required remediation at these sites. As PSE noted in its reply brief, "[t]his appeal is not about whether there should be an offset, but merely the timing of the offset."

Given the complex facts of this case, a burden-shifting rule that is less draconian than the holdings in *Pederson's Fryer Farms* and *Litho Color* is appropriate. We therefore hold that having survived summary judgment by producing evidence that the settlement proceeds it has received may not be allocable solely to the sites at issue in this appeal, PSE must demonstrate how it intends to or has allocated the funds it has received from the settling insurers. At that point, the burden shifts to the insurers to prove that PSE has received adequate compensation.[16] As the Supreme Court held in *Weyerhauser Co. v. Commercial Union Insurance Co.*, 142 Wn.2d 654, 672-75, 15 P.3d 115 (2000), the ultimate burden of establishing that PSE will receive a double recovery is on the insurers.

Finally, we address the first-party insurers. PSE claimed in its complaint that these insurers, who issued policies covering physical damage to property from 1979 to 1985 on the Everett, Chehalis, and A Street properties, must indemnify PSE for the "[p]hysical loss and damage to property, in the form of environmental contamination" that occurred during the policy periods to property PSE then owned. We note at the outset that PSE is not, as the insurers allege, claiming first-party insurance coverage for property damage occurring *after* 1985. It seeks only to recover future remediation costs on these sites that stem from damage incurred during the policy periods. Nevertheless, PSE has not met its burden on summary judgment of identifying disputed issues of material fact on the issue of whether PSE has been adequately compensated for property damage at these sites. PSE's claims that future remediation may be necessary on these sites, in the absence

---

[16] We assume the trial court can fashion discovery orders that protect all parties but still allow access to the information necessary to resolve the issues.

of any evidence that such remediation is likely, is not sufficient to create an issue of fact. This is especially true because the first-party insurers are responsible only for damage to the insured property itself, not to the groundwater or neighboring property. PSE has failed to establish that it has not been fully compensated for any damage to its own property for which the first-party insurers are responsible.

In sum, we reverse and remand PSE's claims against its third-party insurers so that it may demonstrate that some of the insurance proceeds it has received have been or will be allocated to costs on other sites.[17] We affirm the dismissal of PSE's claims against its first-party insurers.

Reversed and remanded in part, affirmed in part.

GROSSE and WEBSTER, JJ., concur.

Review granted and case remanded to the Court of Appeals at 143 Wn.2d 1008 (Apr. 10, 2001).

Opinion amended by order of the Court of Appeals December 14, 2001.

Review granted at 146 Wn.2d 1016 (July 1, 2002).

---

[17] Depending upon the terms of the policies, these costs may also include expenses for defense.