138 P.3d 1068 (2006)
PUGET SOUND ENERGY, Respondent,
v.
CERTAIN UNDERWRITERS AT LLOYD'S, LONDON and Certain London Market Insurance Companies, Appellants,
American Motorist Insurance Company; Appalachian Insurance Company; Central National Insurance Company of Omaha; Continental Insurance Company; Granite State Insurance Company; Indemnity Insurance Company of North America; Safeco Insurance Company; Stonewall Insurance Company; Travelers Casualty & Surety Company; and Westport Insurance Corporation, Defendants,
Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies, Appellants,
v.
Associated Electric & Gas Insurance Services Limited (AEGIS), Respondent,
Great American Insurance Company; Pennsylvania Lumbermens Mutual Insurance Company; and Protective Insurance Company of Omaha, Third-Party Defendants.
No. 54106-4-I.
Court of Appeals of Washington, Division 1.
May 30, 2006.
Publication Ordered July 14, 2006.
*1069 Linda Blohm Clapham, Robert Leon Israel, Lane Powell PC, Seattle, WA, Kate Cutler, Paul J. Killion, Andrew K. Gordon, Hancock Rothert & Bunshoft, San Francisco, CA, for Appellant/Cross-Respondents Certain London Market Insurance Certain Underwriters at Lloyds, London.
Patrick Michael Paulich, Thorsrud Cane & Paulich, Seattle, WA, David M. Cassidy, Alan Rutkin, Rivkin Radler LLP, Uniondale, NY, for Respondent Associated Electric & Gas Insurance Svc's.
Lawrence Gottlieb, Betts Patterson Mines, P.S., Seattle, WA, for Respondent Pennsylvania Lumbermen's Mutual Insurance.
Jeffrey Tilden, Daniel Stephen Houser, Gordon Murray Tilden LLP, Seattle, WA, for Respondent/Cross-Appellants Puget Sound Energy.
Thomas Stephens James, Opus Law Group PLLC, Seattle, WA, for Amicus Curiae Complex Insurance Claims Litigation Assn.
GROSSE, J.
¶ 1 Under Weyerhaeuser Co. v. Commercial Union Ins., Co.[1] and Puget Sound Energy v. ALBA Gen. Ins.,[2] before a setoff is allowed, the non-settling insurer in an environmental cleanup litigation has the burden of proving that the insured has been made whole by its settlements with other insurers. Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (London), the sole insurer who did not settle in this case, is not entitled to a setoff because it failed to carry its burden of proving Puget Sound Energy (Puget) had been made whole by prior settlements with other insurance companies.
¶ 2 In an effort to encourage settlement, the trial court in this case also issued an order barring contribution actions against those insurers who settled with Puget. London sought contribution against only one of the settling insurers, Associated Electric & Gas Insurance Services Limited (AEGIS), claiming the contribution bar order was unfair because it failed to adequately protect their rights. However, London's rights were protected insofar as it had the opportunity to prove it was entitled to a setoff. Because London failed to carry its burden of proving it was entitled to a setoff, London is not entitled to the relief it seeks. We affirm.

FACTS
¶ 3 In 2001, Puget Sound Energy (Puget) sued its insurers to recover money it spent cleaning up environmental contamination at three sites located in Washington: Buckley Headworks, Shuffleton Steam Plant, and the Grady Way Complex. The complaint sought declaratory relief and damages against twelve of Puget's liability insurers, including Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (London). Puget settled or arbitrated and dismissed its claims against each of its insurers except for London.
¶ 4 This lawsuit, herein referred to as the "Puget III" action, was the third environmental coverage suit brought by Puget against its insurers. In 1992, Puget brought a coverage action for property damage associated with the Mission Pole Site (Puget I). All parties, including London, settled the action. In 1995, Puget brought a second coverage action relating to 15 more polluted sites *1070 (Puget II). All parties, including London, settled before trial. Also settling in the Puget II action was Associated Electric & Gas Insurance Services Limited (AEGIS). As part of its settlement with Puget in Puget II, AEGIS gained a release from liability for the three sites that ultimately would be the subject of the Puget III litigation.[3]
¶ 5 The Puget III trial was split into three phases. In Phase I, the trial court was to determine:
(1) The amount of the AEGIS settlement [secured during Puget II], if any, to be allocated to the three sites at issue in this litigation ("Puget III sites");
(2) Whether the amount allocated from the AEGIS settlement to the Puget III sites, if any, exceeds PSE's recoverable damages in this action and, if so, whether there is a full offset;
(3) If the amount allocated from the AEGIS settlement to the Puget III sites, if any, does not constitute a full offset, what is the proper method by which to apportion this amount to the Puget III sites (e.g., pro rata or smallest site first or some other method); and
(4) If the amount allocated from the AEGIS settlement to the Puget III sites, if any does not constitute a full offset, what specific amount from the total allocated settlement amount should be allocated to each of the Puget III sites.
During Phase II a jury would determine:
(1) Whether or not there is coverage under any policies at issue as to each site; and
(2) If any coverage is found under any policies, the trier of fact will determine the amount of damages plaintiff is entitled to recover as to each site.
Finally, during Phase III, the trial court would determine:
(1) Whether Puget Power has received more in settlements pertaining to the Puget III sites than the damages it has proved at trial (and thus, has been made whole) and, if so, whether there is a full offset;
(2) The amount as to each site, if any, which the remaining insurers may apply as a partial credit against the damages they owe to Puget Power;
(3) The appropriate method or process by which to determine each insurer's share of the damages as to each site;
(4) Each of the remaining insurer's share of the damages as to each site;
(5) Each of the settling insurers or non-sued insurers share of the damages as to each site; and
(6) If the amount Puget Power has received in settlement from each setting or non-sued insurer as to each site is less than the settling or non-sued insurer's share of damages as to that site, the Court will determine whether Puget Power or the remaining insurers will bear the loss of such inadequate settlement.
¶ 6 Phase I was tried to the bench and on June 2, 2003, the court issued its findings of fact and conclusions of law. The court found Puget's past cleanup costs for the Puget II sites to be approximately $13,796,830 and its past cleanup costs at the Puget III sites to be approximately $3,550,000. It also found that Puget's attorney's fees and costs in the prosecution of Puget II totaled approximately $1,171,432. Furthermore, the trial court noted that Puget's liabilities under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) and Model Toxics Control Act (MTCA) are "perpetual and unlimited in amount" and that Puget had paid almost $1,000,000 in remediation costs at one Superfund site and "was contacted the week of May 19, 2003 by the purchaser of a portion of the Grady Way property at issue in Puget III with a complaint that polyaromatic hydrocarbons had been found on the site."
¶ 7 The court also determined that Puget had settled the Puget II litigation with each of the insurance defendants for amounts totaling *1071 $13,305,248.90. The court stated that in exchange for these payments, Puget executed releases with the insurance companies for most or all of the following:
 Past costs at the Puget II sites.
 Anticipated future costs at the Puget II sites.
 Unknown future costs at the Puget II sites.
 Past costs, future anticipated costs, and unknown future costs at additional sites.
 Prejudgment interest liabilities with respect to all past costs identified above.
 Olympic Steamship fees.
 Liability for bad faith, violation of the Washington Consumer Protection Act, etc.
 With respect to three insurance companies, Great American, Harbor, and United Pacific, Puget released them from liability for the Shuffleton Steam Plant site (subsequently identified in Puget III) for amounts of $110,000, $100,000, and $20,000 respectively. . . .
With respect to AEGIS, Puget agreed to a settlement in which AEGIS agreed to pay Puget $6,662,000 "in return for a release of, at a minimum, all past and future costs, known or unknown, at the Puget I sites, the Puget II sites, the sites that would subsequently be the subject of Puget III, the additional sites not subject to any litigation, and certain other claims."
¶ 8 In reaching its decision denying London an offset in Phase I of the trial, the trial court described this release obtained by AEGIS using language borrowed from Washington Supreme Court decisions in Weyerhaeuser Co. v. Commercial Union Ins. Co.[4] and Puget Sound Energy v. ALBA Gen. Ins.[5] as an "unquantifiable basket of risks" and stated:
The interesting thing to me, from a legal point of view, of both the ALBA decision and the Weyerhaeuser decision is that the Supreme Court puts into the calculus the fact that some amounts cannot be known, because you are talking about an unquantifiable basket of risks.
So it raises the issue in my mind, how could any one find as a matter of law that someone is made whole, if you have an unquantifiable basket of risk? But again my job is not to make the law. My job is to apply the law.
Ultimately, the trial court denied London's request for an offset finding that "[b]ased on the evidence presented, Puget has not been made whole with respect to the Puget II settlements." Furthermore, in its oral ruling the trial court stated that based on the evidence presented, none of the money paid by AEGIS in its settlement with Puget was to be allocated to the Puget III sites. In short, the trial court essentially concluded that none of the AEGIS settlement was to be allocated to the Puget III sites because the AEGIS settlement had not made Puget whole with regards to the Puget II sites. The court thus found it unnecessary to address the three remaining issues in Phase I.
¶ 9 At the conclusion of Phase II, the jury returned special verdicts with regards to the three sites. With regards to the Buckley Headworks and Shuffleton Steam Plant sites, the jury found that groundwater property damage did not occur at those sites during the policy periods in question. Thus, London was not liable to cover Puget's remediation costs for those sites. However, the jury found that groundwater property damage occurred at the Grady Way site during the policy periods in question and determined Puget's reasonable and necessary cost of remediation at the site to be $236,313.79.
¶ 10 The trial then proceeded to Phase III to determine whether Puget had been made whole by its prior settlements, thereby entitling London to an offset for the jury verdict. In its findings of fact and conclusions of law, the trial court stated that Puget had received $2,246,986.25 in settlements from insurance companies with respect to the Puget III sites. The court also stated that in return for these payments:

*1072 Puget executed releases with the various insurance company defendants that released them from liability for (depending on the insurer) most or all of the following:
 Past costs at the three Puget III sites.
 Future costs at the Puget III sites.
 Past and future costs at additional portions of the Buckley, Grady Way and Shuffleton sites:
 Most or all insurers paid for a release of areas at Buckley other than those tried in Phase III.
 INA paid for a release of other areas at Shuffleton.
 Prejudgment interest liabilities with respect to all past costs identified above.
 Olympic Steamship fees.
 Liability for bad faith, violation of the Washington Consumer Protection Act, etc.
 Other of the coverage obligations under the insurance policies.
 Other risks that may have been perceived by the settling insurance company.
The trial court concluded that based on the evidence presented, London did not carry its burden of showing that Puget had been made whole with respect to the Buckley Headworks, Grady Way and Shuffleton Steam Plant sites. In doing so, the trial court stated that it was comparing the total settlement amount with "the total amount of cleanup costs at the site of $3,550,000" instead of comparing the settlement amount with the jury verdict of $236,313.79. Furthermore, the court stated that there was an "unquantifiable basket of risks" that were part of the settlement amount including "such things as future costs not incurred [at] each of the site[s], prejudgment interest, claims for attorneys fees and costs, under Olympic Steamship or under the Washington Industry Code, or Consumer Protection Act, any other risk perceived by the settling insurance company." As a result the court stated, "So when I look at that, and I look at the law, I look at the amount of costs incurred versus the amount settled, as I said, I cannot find [Puget has been made whole]."
¶ 11 The court then found "Issues 2 through 5" moot and proceeded to determine whether London or Puget should bear the burden of the shortfall for the inadequate settlement. The trial court determined that "[p]ursuant to American Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 134 Wash.2d 413, [951 P.2d 250] (1998) and Washington's public policy of encouraging settlement, the burden of any shortfall from any inadequate settlement shall fall on the non-settling insurers and not on Puget." The court thus determined that London was responsible for the entire $236,313.79 jury verdict.
¶ 12 The issue of whether London was entitled to seek contribution from the settling insurers also arose during Phase III. Early in the litigation, in January 2002, London had filed a cross-action for indemnity and contribution against various insurers, including AEGIS, in order to protect their rights. In the spring of 2002, Appalachian Insurance Company (Appalachian), one of the defendants in the Puget III litigation, reached a settlement-in-principle with Puget. Based on the agreement, it filed a motion to approve settlement and bar contribution. In its motion, Appalachian sought a contribution bar order based on its settlement in principle with Puget. The trial court initially denied the motion, but granted it on reconsideration. In its order imposing the contribution bar the court stated:
This court will grant an order to bar contribution claims with the proviso that plaintiff is not thereby protected from being the party that will bear the loss should the settlement be inadequate. The court has not yet determined if the loss shall sit with plaintiff or non-settling defendants. The appropriate method for allocating shares or liability has not yet been determined in this case.
Therefore, settling defendants such as Appalachian will have contribution or indemnity claims against them barred; it will await another order to determine whether plaintiff or non-settling defendants, or a combination of the two will absorb any loss from an inadequate settlement.
*1073 London moved for reconsideration, but its motion was denied. In February 2003, AEGIS moved to dismiss London's contribution claims against it. On April 10, 2003, citing the contribution bar order, the trial court dismissed London's contribution claim with prejudice.
¶ 13 London now appeals, claiming that the trial court erred as a matter of law when it concluded that London was not entitled to any offset for prior insurer settlements and that the trial court erred as a matter of law in dismissing London's contribution claim against AEGIS. Puget cross-appeals, claiming there was an erroneous jury instruction in the Phase II trial and claiming the trial court erred in granting one of London's motions in limine during the Phase II trial.

ANALYSIS

Offset
¶ 14 London's claim that it is entitled to offset the $236,313.79 jury verdict with the AEGIS settlement of $6,662,000 and/or the settlements with other insurers totaling $2,246,986.25 turns on the application of the Washington Supreme Court's recent decisions in Weyerhaeuser Co. v. Commercial Union Ins. Co.[6] and Puget Sound Energy v. ALBA Gen. Ins.[7]
¶ 15 In Weyerhaeuser, the Washington Supreme Court held that it is the insurer seeking an offset that has the burden of proving that the insured has been made whole before an offset is allowed. In that case, Commercial Union Insurance Company (CU) sought to set off settlement funds received by Weyerhaeuser from other insurance companies against jury verdicts in an environmental cleanup action. The trial court denied CU's motion and the Supreme Court affirmed.
¶ 16 In doing so, the Weyerhaeuser court adopted the rule set forth in Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co.[8] In Pederson's the insured, Pederson's, sought to recover expenses incurred in cleaning up contamination from an underground gas tank. Pederson's settled with insurers for $32,000 and prevailed in a suit for cleanup costs from a third insurer, Transamerica. However, the court denied Pederson's request for an offset, stating:
The settlement, however, was not mere payment for Pederson's cleanup costs; it was in exchange for a release of liability for all past, present and future environmental claims. Transamerica did not demonstrate what part, if any, of the settlement was attributable to cleanup costs. Thus, no showing of double recovery was made. The trial court acted appropriately by not reducing the award.[9]
Likewise, the Weyerhaeuser court stated:
[T]he insurers that chose to settle in this case received far more than a simple release of liability at specific sites. Rather these companies also purchased certainty by avoiding the risks of an adverse trial outcome  not to mention forgoing the expenses associated with a lengthy trial and appeal. As the insurers "paid Weyerhaeuser for a release from an unquantifiable basket of risks and considerations," we cannot say the settlements simply constituted payment for Weyerhaeuser's cleanup costs. Further, the rule articulated by Pederson's is supported by "Washington's strong public policy of encouraging settlements." Seafirst Ctr. Ltd. P'ship v. Erickson, 127 Wash.2d 355, 366, 898 P.2d 299 (1995).
¶ 17 Applying this rule, the Weyerhaeuser court determined that the trial court's finding that Weyerhaeuser had not been made whole was supported by substantial evidence. Specifically, the court stated Weyerhaeuser had provided the court with evidence establishing that its past costs alone greatly exceeded the settlement funds and that CU failed to rebut these figures. The court stated:
Although CU asserts it conclusively showed Weyerhaeuser had been made *1074 whole and, in fact, had $5,000,000 remaining, its citations to the record in support of this assertion are wholly inadequate. CU simply directs this court to its earlier trial memoranda and a 400-page declaration from counsel  documents containing almost entirely of confidential settlement agreements  with no showing of how this evidence supports CU's allegations. Further, confidential settlement communications are inadmissible for purposes of establishing Weyerhaeuser's liabilities.[10]
In short, because the risks and liabilities released in the settlement agreements were broader than the cleanup costs determined by the jury in the litigation at hand, CU's failure to affirmatively show how the settlement proceeds made Weyerhaeuser whole was fatal to their case.
¶ 18 The Washington Supreme Court reasserted its confidence in the Weyerhaeuser holding in Puget Sound v. ALBA.[11] The ALBA decision grew out of a court of appeals decision that was issued just prior to Weyerhaeuser.[12] There, a group of non-settling insurers moved for summary judgment against Puget on grounds that Puget had already been made whole in settling with other insurers. Puget claimed that because some of the settlement proceeds the other insurers paid were given in exchange for the releases of other sites not part of the litigation, summary judgment was inappropriate. The Court of Appeals agreed.
¶ 19 The Court of Appeals then went on to discuss at length who should carry the burden of proving that the settlement proceeds had made Puget whole with regards to its remediation costs for the sites at issue. Puget argued that the court should rely on Pederson's and find that the non-settling insurers carried the burden, while the non-settling insurers cited to Litho Color, Inc. v. Pacific Emplrs. Ins. Co.,[13] arguing that they were entitled to a complete offset of settlement proceeds unless Puget provided them with the specific amount of proceeds it had allocated, or would allocate, to each individual site.
¶ 20 The Court of Appeals rejected both approaches as "draconian."[14] In rejecting the Pederson's rule, the Court of Appeals stated: "We agree that when faced with a policyholder's clear refusal to allocate settlement proceeds, an insurer cannot be required to do so because only the policyholder has the critical information."[15] Instead, we adopted a burden-shifting rule, stating:
We therefore hold that having survived summary judgment by producing evidence that the settlement proceeds it has received may not be allocable solely to the sites at issue in this appeal, PSE must demonstrate how it intends to or has allocated the funds it has received from the settling insurers. At that point, the burden shifts to the insurers to prove that PSE has received adequate compensation.[16]
¶ 21 Puget sought review to the Washington Supreme Court, but before review could be considered, the Weyerhaeuser decision was handed down. The Supreme Court granted review and remanded the ALBA decision to the Court of Appeals for reconsideration in light of Weyerhaeuser. On remand, the Court of Appeals did not reverse its position but simply added one sentence to its original decision, stating: "As the Supreme Court held in Weyerhaeuser Co. v. Commercial Union Ins. Co., the ultimate burden of establishing that PSE will receive a double recovery is on the insurers."[17] The Supreme Court then granted review once again.
*1075 ¶ 22 In its decision, the Supreme Court stood firmly behind the rule adopted in Weyerhaeuser and Pederson's, stating that under the reasoning of these cases:
if a nonsettling insurer seeks to offset its responsibility for a claim using proceeds from such a settlement, it has the burden of establishing what part of the settlement was attributable to the claim it seeks to offset.[18]
The court rejected the Court of Appeals rule stating that it places a threshold burden on the insured that "contradicts and is inconsistent with the Weyerhaeuser (and Pederson's) rule."[19] The court reasoned that "[i]f the insured were forced to disclose how every dollar was spent, there would be no incentive for any insurance company to settle claims of this magnitude."[20] Furthermore, the court explained:
The Court of Appeals rule would require PSE to produce more than its known information, i.e., it is more than a burden of production. To the extent that PSE has not allocated its settlement proceeds in the past, the Court of Appeals is requiring PSE to predict how in the future some of the settlement proceeds will be used. The rule forces PSE to allocate that which has not been allocated or is not yet able to be allocated. In other words, as a condition to pursuing claims for the sites at issue, PSE must assign a price tag to each of the risks in its unquantified bundle of settled risks. This analysis is far more than a simple burden of production: it is the exact burden of proof assigned to the insurers in the Weyerhaeuser case.[21]
The court ultimately concluded that since Puget had "established that the settlement proceeds at issue were secured by releasing risks broader than those at issue" in the case at bar, Puget's claims should survive summary judgment.[22]

Phase I: The AEGIS settlement
¶ 23 London claims the trial court erred in not allowing it to use the AEGIS settlement as an offset. At the end of Phase I, the trial court concluded in its oral findings that based on the evidence before it, none of the AEGIS settlement should be allocated to the Puget III sites. The trial court also stated in its written conclusions of law that Puget had not been made whole with respect to the Puget II settlements. The court then declined to address the other three Phase I issues.[23] The court did not make a specific written finding as to the Puget III sites but instead seemed to imply that because Puget had not been made whole with regards to the Puget II claims, none of the AEGIS settlement was attributable to the Puget III sites; therefore, London could have no claim to either a full or partial offset for the Puget III sites.
¶ 24 The trial court's decision that AEGIS paid nothing in return for a release from the Puget III sites contradicts the evidence in the record and is inconsistent with the trial court's other findings. For example, counsel for Puget admitted that it had assigned some value to the Puget III sites during settlement negotiations. As stated by Puget's counsel:
We have never disputed, as a subjective matter, both AEGIS and Puget assigned some value to these sites. AEGIS says it is a high value. We said it was a lot lower. But we agree that it was some positive number.
¶ 25 Furthermore, as we stated in Litho Color, the trial court does not have the authority to apportion settlement amounts unilaterally because the trial court can only *1076 speculate as to the value the parties attached to settled claims.[24] However, in spite of the conclusion by the trial court which assigned none of the AEGIS settlement proceeds to the Puget III sites, its oral findings firmly support Puget's argument that according to Weyerhaeuser and ALBA, London failed to carry its burden of proving that Puget had been made whole with regards to the Puget III claims.
¶ 26 According to Weyerhaeuser and ALBA, London had the burden of establishing what part of the AEGIS settlement was attributable to the claims at issue in the present litigation. In its oral ruling, the trial court specifically found that neither AEGIS nor Puget really know how much of the settlement was going to be allocated to the Puget III sites.[25] London claims that as part of the settlement negotiations for the Puget II sites, AEGIS offered an additional $1.62 million in exchange for releases of the Puget III sites, and that the $1.62 million should be used to offset the claims made in the present litigation. However, the trial court pointed to the testimony of counsel for AEGIS who participated in the settlement negotiations, and stated:
The import of that testimony is even though that there was argument back and forth about this 1 million dollar plus amount that was thrown in, so-called into the settlement to resolve the three Puget III sites from AEGIS having exposure to them, even Mr. Antunes, who is AEGIS counsel in this, has no way of really knowing how that money would be allocated. And was quite clear, I felt in his testimony, that it wasn't an explicit term of the settlement that was negotiated between the parties.
Therefore, I would conclude as a factual matter that this Court cannot find that there was a specific allocation made of that settlement for all future risks that Puget would be settling for in that litigation.
The trial court's finding that there was no specific allocation of the settlement funds for the future risks at the Puget III sites is thus supported by substantial evidence. Furthermore, the trial court's finding that the settlement agreement released AEGIS from risks that were broader than those at issue in this litigation is supported by the settlement agreement. Thus, under Weyerhaeuser and ALBA, the trial court did not err in finding that London failed to carry its burden of proving Puget had been made whole, and thus denying London an offset with regards to the AEGIS settlement, either before or after the value of Puget's claim was determined by the jury verdict.

Phase III: Other Insurance Settlements
¶ 27 In Phase III, London sought to prove that Puget had been made whole by settlements with other insurers with regards to the Puget III liabilities determined by the jury. Unlike the AEGIS settlements, these settlements involved only the sites at issue in the Puget III litigation (Buckley, Grady Way, and Shuffleton). The jury determined in Phase II that London was liable only for cleanup costs at the Grady Way site, totaling $236,313.79. The jury found no liability as to the Buckley and Shuffleton sites because it found no groundwater contamination occurred at those sites during the policy periods.
¶ 28 In its conclusions of law, the trial court cited Weyerhaeuser and ALBA and determined that "[b]ased upon the evidence presented, London Market Insurers have not carried their burden of showing that Puget had been made whole with respect to the Buckley Headworks, Grady Way, and Shuffleton Steam Plant sites." In reaching this conclusion, the trial court explained it was comparing the settlement amounts of $2,246,986.25 with the $3,550,000 in cleanup costs claimed by Puget instead of the $236,313.79 in proven and covered costs determined by the jury in order to determine whether Puget had been made whole. London claims this was error and we agree.
*1077 ¶ 29 As stated by the Supreme Court in ALBA, "if a non-settling insurer seeks to offset its responsibility for a claim using proceeds from such a settlement, it has the burden of establishing what part of the settlement was attributable to the claim it seeks to offset."[26] In other words, before an insurer may be awarded an offset, it must show the amount of the settlement attributed to the claim it seeks to offset is enough to fully compensate the insured for the value of the insured's claim. Here, the value of the claim made by Puget was proven at trial to be worth $236,313.79, not $3,550,000. The trial court's failure to use the jury verdict as the measure of whether Puget had been made whole with regards to its claims against London was therefore erroneous.[27]
¶ 30 However, this does not mean that London carried its burden of proving that Puget had been made whole as to the $236,313.79 jury verdict. The only argument presented by London at the Phase III trial was that since $2,246,986.25 is more than $236,313.79, there is a full offset. Because Puget showed that the settlements were for risks broader than the ones at issue in Puget III,[28] London must do more than simply compare the amounts. London, "has the burden of establishing what part of the settlement was attributable to the claim it seeks to offset" or put another way London must "assign a price tag to each of the risks in [Puget's] unquantifiable bundle of settled risks" and prove that the price assigned to the liabilities determined by the jury was enough to cover the verdict of $236,313.79.[29] Of course, quantifying the unquantifiable and allocating what is not yet able to be allocated is an impossible task, but it is one the Supreme Court has assigned to insurers such as London as an incentive for them to settle their claims. The Supreme Court has stated the law, and we are obliged to follow it. The trial court's decision denying London's request to a full offset of the jury verdict with settlement proceeds collected from other insurers is supported by substantial evidence and is affirmed.
¶ 31 Nor is London entitled to a partial setoff. First of all, the trial court does not have the authority to apportion settlement amounts unilaterally because, "the trial court could only speculate as to the value the parties attached to settled claims."[30] Secondly, it is London who bears the burden of proving how the settlement proceeds were allocated, and it failed to carry that burden in this case. And finally, the trial court's finding that there was no specific allocation of the settlement to the future risks at the Puget III sites would render impossible a determination of the amount of any offset.

Contribution
¶ 32 Having upheld the trial court's ultimate decision denying London an offset for both the AEGIS settlement and the other settlements, we must decide whether the trial court erred in also barring London from seeking contribution from AEGIS. London seeks contribution only from AEGIS because London has chosen to concede that the other insurers had paid enough in settlements to cover their share of the jury verdict for purposes of contribution. Because the trial court found that AEGIS paid nothing for the Puget III sites, London argues that it is *1078 entitled to contribution from AEGIS. AEGIS, however, seeks protection behind the trial court's contribution bar order.
¶ 33 Having already found that the trial court erred in finding that AEGIS paid nothing for the release of the Puget III sites,[31] we are left with two questions. First, whether the trial court had the authority to issue a contribution bar order, and second, if the trial court had such authority, how are the interests of non-settling insurers like London to be protected?
¶ 34 The trial court was aware of these issues when it issued the contribution bar order. Judge J. Kathleen Learned's bar order reads:
Public policy in Washington favors the settlement of cases in whole or in part, and defendants who wish to settle should be able to do so without fear of being reexposed to litigation and liability after settlement. However, non-settling defendants are entitled to their day in court and should not necessarily be exposed to greater liability than they would otherwise have due to settling defendants. The authorities cited by Appalachian in general state that contribution claims can be barred as long as the rights of the other parties are protected. Here there is as yet no mechanism in place to protect the rights of the non-settling defendants. This implies some form of system that would leave plaintiffs bearing the loss of an inadequate settlement with Appalachian. Plaintiff have [sic] not agreed to such a scheme and neither did Appalachian request it in their motion. This court will grant an order to bar contribution claims with the proviso that plaintiff is not thereby protected from being the party that will bear the loss should the settlement be inadequate. The court has not yet determined if the loss shall sit with plaintiff or non-settling defendants. The appropriate method for allocating shares or liability has not yet been determined in this case.
Therefore, settling defendants such as Appalachian will have contribution or indemnity claims against them barred; it will await another order to determine whether plaintiff or non-settling defendants, or a combination of the two will absorb any loss from an inadequate settlement.
The trial court thus recognized that it had the authority to enter a contribution bar order; however, it noted at the same time that the rights of non-settling insurers must be protected, but postponed a decision on how those rights might be protected. What the trial court could not anticipate at the time was that London would ultimately fail in its attempt to obtain a setoff and therefore be prevented from obtaining both a setoff and contribution.
Judge Michael Trickey later assumed responsibility for this case and upheld Judge Learned's contribution bar order. Furthermore, after denying London a setoff under Weyerhaeuser and ALBA, the trial court concluded that London was responsible for the entire jury verdict. The court wrote:
Pursuant to American Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co., 134 Wash.2d 413, 951 P.2d 250 (1998) and Washington's public policy of encouraging settlement, the burden of any shortfall from any inadequate settlement shall fall on the non-settling insurers and not on Puget. Under B & L Trucking, London Market Insurers are jointly and severally liable for damages with respect to the Grady Way site. Under Weyerhaeuser v. Commercial Union and Puget v. Alba, London Market Insurers have the burden of demonstrating that Puget has been made whole with respect to its Grady Way damages. As discussed above, the London Market Insurers have not carried that burden.
B & L Trucking stands for the proposition that "all insurers on the risk during the time of ongoing damage have a joint and several obligation to provide full coverage for all damages."[32] Applying B & L Trucking to this case, the trial court held that because London had failed to prove it was entitled to *1079 a setoff and was barred from seeking contribution from the settling insurers, London was liable for the entire jury verdict.
¶ 36 While Washington case law is silent on the issues surrounding the contribution bar order issued in this case, other courts, including the Ninth Circuit, have addressed similar issues in applying federal law and have endorsed the practice of issuing contribution bar orders in multiparty, complex litigation contexts.[33] In the context of settling federal security litigation the Ninth Circuit in Franklin v. Kaypro Corp. declined to prohibit orders that bar further contribution citing their importance in furthering the public policy interest in settling and quieting litigation.[34] The Kaypro court stated:
"[I]f the non-settling defendants' construction is correct then partial settlement of any federal securities question before trial is, as a practical matter, impossible. Any single defendant who refuses to settle, for whatever reason, forces all others to trial. Anyone foolish enough to settle without barring contribution is courting disaster. They are allowing the total damages from which their ultimate share will be derived to be determined in a trial where they are not even represented."[35]
Because it is consistent with the public policy in Washington of encouraging settlement, we find that the trial court here had the equitable power to issue a contribution bar order.
¶ 37 However, the question still remains: In the event that the contribution bar order is issued, how are the rights of the non-settling insurers such as London to be adequately protected? Or more specifically, how can we ensure that the non-settling insurers never pay more than they would if all the parties had gone to trial? The Kaypro court considered two options aside from prohibiting the bar order altogether. One option, suggested by the Second Circuit in Singer v. Olympia Brewing Co.,[36] is that "the settlement payment acts as an offset: the entire amount of damage is determined at a full trial, the settlement amount is deducted from that amount, and the nonsettling defendants are required to pay the remainder."[37] The Kaypro court rejected this approach, stating that it might encourage collusion among plaintiffs against certain defendants. Furthermore, the court argued "the offset scheme forces nonsettling defendants to pay more than the amount for which they are culpable."[38] It reasoned that "[s]ettlement is attractive to parties because it reduces litigation costs" and thus "plaintiffs are willing to settle for less than they might receive if a claim were fully litigated."[39] As a result, "under the offset scheme, non settling defendants are forced to pay to plaintiffs the amount of the discount."[40]
¶ 38 While the offset model would prove workable in many contexts, it would not work in the case at bar. This is because under the rationale of Weyerhaeuser and ALBA, nobody knows how much of AEGIS's settlement is allocated to the claims at issue in this case. Thus, it would be impossible to determine by how much London's liabilities should be reduced.
¶ 39 The Kaypro court also discussed and ultimately adopted another alternative. In the court's view this model satisfied the three goals of "punishing each wrongdoer, the equitable goal of limiting liability to relative culpability, and the policy goal of encouraging settlement."[41] This model requires the jury to determine not only the total damage amount, but also:

*1080 the percentage of culpability of each of the nonsettling defendants as well as that of the settling defendants. Nonsettling defendants as a whole will then be required to pay the percentage of the total amount for which they are responsible. The nonsettling defendants will be jointly and severally liable for that percentage, and will continue to have rights of contribution against one another.[42]
Furthermore, settling defendants would continue to be protected by the contribution bar order.
¶ 40 However, this approach also does not work in the case at bar because culpability is not an issue here. This is because under B & L Trucking, all insurers on risk during the period of continuing damage are jointly and severally liable for the entire amount of the jury verdict, up to their policy limits. Culpability, therefore, cannot be meted out and percentages assigned to each insurer the way they can for co-defendants in a securities action.
¶ 41 The sole method presented by London on appeal for protecting London's rights in the event the bar order is maintained is to find London is entitled to a setoff. The relief London requests is denied by virtue of our upholding the trial court's ruling that London is not entitled to a setoff because it failed to carry its burden of proving Puget had been made whole by the AEGIS settlement. Furthermore, any partial setoff is denied because the trial court's finding that there was no specific allocation of the AEGIS settlement made by the parties for the risks at issue in this case makes it impossible to determine the size of any partial setoff. The trial court's order barring London from obtaining contribution from AEGIS is affirmed.[43]

Jury Instruction (Puget cross-appeal)
¶ 42 Puget cross-appeals claiming Jury Instruction 13 was erroneous. For strategic reasons, Puget raises this issue only with regards to the Buckley Headworks verdict. Jury Instruction 13 states:
In order to establish that it caused compensable property damage to groundwater, Puget Power must prove by a preponderance of the evidence that it contaminated groundwater, and that during the policy periods the contamination exceeded the levels mandated for cleanup or remediation under the Washington State Model Toxics Control Act [(MTCA)].
Puget Power must also prove by a preponderance of the evidence that the claimed costs were incurred because there was compensable damage to groundwater.
Puget argues that this instruction is erroneous because it requires Puget to show there was an MTCA exceedence during the policy period itself.
¶ 43 Jury Instruction 13 is a correct statement of the law because in order for London's policies to have been triggered, there must have been "compensable damage" or "a covered injury or loss" during the policy periods.[44] Under the terms of London's insurance policies, compensable damage is damage that the policyholder is legally obligated to pay.[45] Under the MTCA, a property *1081 owner is legally liable for third party property damage only when contamination exceeds the limits set forth in the MTCA. For Puget to be legally liable under the MTCA for groundwater contamination during the policy periods in question, it must be proven that the alleged contamination exceeded MTCA levels during those policy periods. If a MTCA exceedance is not proven during the periods of London's coverage, there is no compensable property damage under the MTCA during those periods and London's policies are not triggered. Jury Instruction 13 was not erroneous.[46]
¶ 44 For the above reasons, we affirm.
WE CONCUR: BECKER and BAKER, JJ.
NOTES
[1] Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d 654, 15 P.3d 115 (2000).
[2] Puget Sound Energy v. ALBA Gen. Ins. Co., 149 Wash.2d 135, 68 P.3d 1061 (2003).
[3] The settlements at issue in this case are subject to a confidentiality agreement and were sealed below and remain sealed on appeal.
[4] Weyerhaeuser, 142 Wash.2d 654, 15 P.3d 115 (2000).
[5] Puget Sound Energy, 149 Wash.2d 135, 68 P.3d 1061 (2003).
[6] Weyerhaeuser, 142 Wash.2d 654, 15 P.3d 115.
[7] Puget Sound Energy, 149 Wash.2d 135, 68 P.3d 1061.
[8] Pederson's, 83 Wash.App. 432, 922 P.2d 126 (1996).
[9] Pederson's, 83 Wash.App. at 452, 922 P.2d 126.
[10] Weyerhaeuser, 142 Wash.2d at 675, 15 P.3d 115 (emphasis in original).
[11] Puget Sound Energy, 149 Wash.2d 135, 68 P.3d 1061.
[12] See Puget Sound Energy Inc. v. ALBA Gen. Ins. Co., 109 Wash.App. 683, 10 P.3d 445 (2000).
[13] Litho Color, Inc. v. Pacific Emplrs. Ins. Co., 98 Wash.App. 286, 991 P.2d 638 (1999).
[14] Puget Sound Energy, 109 Wash.App. at 695, 10 P.3d 445.
[15] Puget Sound Energy, 109 Wash.App. at 693, 10 P.3d 445.
[16] Puget Sound Energy, 109 Wash.App. at 695, 10 P.3d 445.
[17] Puget Sound Energy, 109 Wash.App. at 695, 10 P.3d 445.
[18] Puget Sound Energy, 149 Wash.2d at 141, 68 P.3d 1061.
[19] Puget Sound Energy, 149 Wash.2d at 141, 68 P.3d 1061.
[20] Puget Sound Energy, 149 Wash.2d at 141, 68 P.3d 1061.
[21] Puget Sound Energy, 149 Wash.2d at 142, 68 P.3d 1061.
[22] Puget Sound Energy, 149 Wash.2d at 142, 68 P.3d 1061.
[23] These issues included whether the settlement amount allocated to the Puget III sites entitled London to a full offset or whether it entitled London to a partial offset, and if so, how much should that offset be.
[24] Litho Color, 98 Wash.App. at 297, 991 P.2d 638.
[25] "It is clear to me, looking at the evidence before me that neither side really knew how much was going to be allocated to [Puget III]."
[26] See Puget Sound Energy, 149 Wash.2d at 141, 68 P.3d 1061.
[27] The trial court apparently relied on the Supreme Court decision in American Nat'l Fire, 134 Wash.2d 413, 951 P.2d 250, which established joint and several liability for all policies that are triggered by continuing property damage. However, the jury here determined that London's policies were only triggered by contamination at the Grady Way site and that the reasonable and necessary remediation costs at that site were $236,313.79. London therefore cannot be held liable for Puget's claimed cleanup costs for the other sites.
[28] London claims that Puget had a burden to show that it would actually incur additional liabilities at these sites. London is incorrect. All Puget has to show is that the settlements were for risks greater than those at issue in the present litigation, and it is London's burden to show the settlement funds allocated to the liabilities at issue were enough to cover those liabilities. See Puget Sound Energy, 149 Wash.2d at 142, 68 P.3d 1061.
[29] Puget Sound Energy, 149 Wash.2d at 141-42, 68 P.3d 1061.
[30] Litho Color, 98 Wash.App. at 297, 991 P.2d 638.
[31] Litho Color, 98 Wash.App. at 297, 991 P.2d 638.
[32] American Nat'l Fire, 134 Wash.2d 413, 424, 951 P.2d 250 (1998).
[33] See also CR 16(a).
[34] Kaypro Corp., 884 F.2d at 1229.
[35] Kaypro Corp., 884 F.2d at 1229 (quoting In re Nucorp Energy Securities Litigation, 661 F.Supp. 1403, 1408 (S.D.Cal.1987)). See also Fluck v. Blevins, 969 F.Supp. 1231, 1233 (D.Or.1997), and Eichenholtz v. Brennan, 52 F.3d 478, 486 (3d Cir.1995).
[36] Singer v. Olympia Brewing Co., 878 F.2d 596 (2d Cir.1989).
[37] Kaypro Corp., 884 F.2d at 1230.
[38] Kaypro Corp., 884 F.2d at 1230.
[39] Kaypro Corp., 884 F.2d at 1230.
[40] Kaypro Corp., 884 F.2d at 1230.
[41] Kaypro Corp., 884 F.2d at 1231.
[42] Kaypro Corp., 884 F.2d at 1231.
[43] Our decision does not address the impact of the underlying primary insurance policies on excess insurer London's liability for the jury verdict. London argued before the trial court prior to entry of final judgment that its liability should be reduced by the limits of the underlying primary insurance policies. This issue was fully litigated below and the trial court determined that London should bear responsibility for the entire jury verdict. London has not challenged this specific finding on appeal and we do not address it here.
[44] Villella v. PEMCO, 106 Wash.2d 806, 811-12, 814, 725 P.2d 957 (1986).
[45] London's insurance policy states in pertinent part:

This insurance, subject to the terms, conditions and limitations hereinafter mentioned, is to indemnify the Assured in respect of accidents occurring during the [policy] period . . . for any and all sums which the Assured shall by law become liable to pay and shall pay or by final judgment be adjudged to pay to any person or persons . . . as damages
. . .
(b) for damage to or destruction of property of others (excluding property under the Assured's care, custody or control) caused by accident, hereinafter referred to as "Property Damage". . . .
(Emphasis added).
[46] Since Puget's request for a new trial is denied, Puget's request for an advisory opinion on an evidentiary issue in the event of a new trial is also denied.